JOHN W. ELLIS *et al. vs.* FIRST NATIONAL BANK OF WOONSOCKET.

PROVIDENCE—APRIL 3, 1901.

PRESENT : Stiness, C. J., Tillinghast and Rogers, JJ.

(1) *Banks and Banking.*

The A. company, being insolvent, made an assignment to B. for the benefit of its creditors. At the time there was on deposit to the credit of the assignor, in the N. bank, the sum of $28,213.19, and at that time the bank was the holder and owner of three notes made by the A. company, signed in its name by X. its treasurer, payable to the order of X. and by him indorsed. . At the time of the assignment two of the notes had matured, and the third was not due. X. was also cashier of the bank. After the assignment X. consented to the transfer of the account of the A. company to the assignee, who received a pass-book in his name, although the account was not changed on the books of the bank. After the maturity of the last note the assignee drew a check for the whole amount to the credit of the A. company on the books of the bank, but to his credit on the pass-book, and payment was refused. Subsequently the bank allowed the balance over the amount of the three notes, with interest, to be withdrawn. The assignee brought suit to recover this last sum, and, after judgment for defendant, on petition for new trial :—

*Held,* that the cashier had no authority *virtute officii* to surrender or release the security of the bank ; and while the acts of a cashier, within the scope of the general course of business of the institution, are binding upon the corporation in favor of third persons without knowledge of the lack of authority, yet, under the circumstances of the case, the assignee, with his knowledge, must be held to have known that the cashier was transcending his authority.

*Held,* further, that the assignee was not entitled to recover so much of the deposit as was required to pay the notes held by the bank, that were overdue, at the time of the transfer of the deposit.

*Held,* further, that the bank should not, however, be allowed to reap any advantage by their repudiation of the conduct of the cashier, which did

not militate against the bank's interests and would enure to the detriment of the assignee; therefore, as the bank had no right of set-off at the time of the transfer as to the note not then matured, the assignee was entitled to recover back the amount of the note with interest.

ASSUMPSIT.   The facts are stated in full in the opinion. Heard on petition of plaintiff for a new trial.   Judgment entered for plaintiff for a part of the demanded sum.

ROGERS, J.   This is a petition by the plaintiffs for a new trial of an action of assumpsit for a bank deposit, in a jury trial waived case.

On the 10th day of February, 1899, the plaintiffs accepted the positions of assignees under a deed of assignment made February 6, 1899, by the American Worsted Company, a Rhode Island corporation, for the benefit of its creditors, the said assignor having become insolvent.   On the said 10th day of February, 1899, there was on deposit in the defendant bank, in the name and to the credit of said American Worsted Company, the sum of $28,213.19 ; and at that same time the defendant bank was the holder and owner, in its own right, of three promissory notes made by said American Worsted Company, duly signed in its name by R. G. Randall, its treasurer, payable to the order of R. G. Randall, and by him indorsed.   The first of said notes was for $2,500, dated June 27, 1893, payable six months after date, and interest thereon had been paid up to December 20, 1898.   The second was for $3,700, dated June 30, 1898, payable six months after date ; and the third was for $2,500, dated September 5, 1898, and was also payable six months after date.

On said 10th day of February, 1899, the plaintiffs, after having accepted said deed of assignment, and having deposited said deed for record, proceeded to the defendant bank and interviewed the cashier thereof, informing him that they had accepted the trust, and that John W. Ellis, one of their number, was authorized to draw checks in their names. They obtained from him a statement of the amount of the deposit in the bank to the credit of the American Worsted Company, and the cashier agreed to honor the checks drawn

by Mr. Ellis, and directed the assistant cashier and the clerks to honor Mr. Ellis's checks.   There is some contradiction in the testimony, some of the witnesses swearing that the cashier said that the bank would transfer the account to the assignees and that it would be unnecessary to draw a check in the name of the company and redeposit it in the name of the assignees.   The cashier denies this, but admits that he did agree to honor Mr. Ellis's checks and did notify his assistant and the clerks to honor them.   At said interview no reference was made to the promissory notes above referred to, nor to any lien or claim for lien on the deposit.   The justice presiding at the trial of the case found, as a fact from the evidence, that the cashier did agree to transfer the account to the assignees.

On said 10th day of February, 1899, the assignees made a deposit in said defendant bank upon a deposit-ticket made out in their names as assignees, and the clerk of the bank receiving the deposit gave them a pass-book with the balance to the credit of the American Worsted Company as the first credit, and with the assignees' deposit of that day as the second credit thereon ; and thereafter, from time to time, several deposits made by the assignees were entered by the bank officials on that pass-book.   In said book, when issued by the clerk of the bank, the place for the depositors' name was left blank, it being understood that the clerk of the assignees should stamp in the name with a rubber stamp, and the assignees' names were stamped in when the assignees' clerk returned to his office, but the bank clerk swore that the name to have been stamped in was that of the American Worsted Company, and not those of the assignees. Both the cashier and the assistant cashier of the bank denied all knowledge of such a pass-book ever having been issued by the clerk, and swore that they never authorized any such issue.

The American Worsted Company's account was not changed on the books of the defendant bank, but on the 2nd of March, 1899, by direction of the assistant cashier, an account starting with an overdraft was opened with the assignees on the

bank's books, and four days later (March 6) that assignees' account was changed back again to the American Worsted Company's account, which during all this time had a large balance to its credit.

On March 10, 1899, two days after the maturity of the last note held by the defendant bank, the assignees drew a check for the whole amount standing to the credit of the American Worsted Company on the books of the bank, but to their own credit on said pass-book, and payment was refused. Subsequently, on June 23, 1899, the bank allowed the sum of $17,123.70 to be drawn from that account by the assignees, leaving still standing on the bank's books to the credit of the said company $8,754.41, that being the amount of the three aforesaid notes with interest, and which amount the bank claimed by way of set-off against said notes.

(1)    Is the bank entitled to hold, as against said assignees, all or any of said last-named balance?

The situation, in brief, seems to have been as follows: Mr. Randall was treasurer of the American Worsted Company, was also cashier of the defendant bank, and individually was indorser upon the notes signed by him as treasurer, which were discounted by the bank of which he was cashier, and where his treasurer's bank-account was kept. He knew the maker was insolvent, for he, as treasurer, had in its name just executed a deed of assignment, for the benefit of its creditors, to the plaintiffs. He knew that two of said notes were past due, and that the other would become due in about a month, to wit, on March 8th, for he had signed the notes for the maker, had indorsed them as an individual, and then held the manual possession of them as cashier of the defendant bank. He knew that the bank of which he was cashier was entitled to a lien upon the very ample deposit of the American Worsted Company to secure all notes made by said company that were past due. As indorser one would suppose his interest would be best subserved by the bank's keeping the American Worsted Company's deposit in such name and condition as would enable the bank to get its full pay out of the maker's funds, by way of set-off, so that he

would not be called on as indorser. It may be, however, that he thought that if the bank gave up its right to a lien on the deposit of the maker of the note, that would release the indorser. When one was acting in so many diverse capacities, it is difficult to say which interest and what considerations might have affected him most, and the question certainly becomes very pertinent how far he could act as the representative of one interest to its detriment in connection with the affairs of his other interest.

"The general control and government of all the affairs and transactions of the bank," says Morse in his work on Banks and Banking, vol. 1, § 116, "rest with the board of directors. . . . Organic banking laws and charters customarily confer upon the board the general power to conduct and manage the corporate business. But this language is practically only a recognition of the functions which the board would be entitled and called upon to exercise by the rules of the common law, and does not operate to enlarge those functions; or to designate them with any greater particularity. Neither can the duty thus conferred be construed as a requisition upon the directors to undertake the performance, in person, of all the acts called for by the daily routine of the business of the bank. . . . Though it has been said that powers of a public character given by the legislature to any body of individuals can never be sub-delegated by the recipients, yet this doctrine has never been allowed to prohibit bank directors from appointing agents and endowing them with sufficient powers for executing the resolutions of the board, and carrying on, without specific authority in each individual case, the ordinary transactions of daily business."

The general authority of the cashier of a bank is thus stated by the United States Supreme Court, speaking by Swayne, J., in *Merchants Bank* v. *State Bank*, 10 Wall. 604, 649 : "It is his duty to receive all the funds which come into the bank, and to enter them upon its books. The authority to receive implies and carries with it authority to give certificates of deposit and other proper vouchers. Where the money is in the bank he has the same authority to certify

a check to be good, charge the amount to the drawer, appropriate it to the payment of the check, and make the proper entry on the books of the bank.    This he is authorized to do *virtute officii.*    The power is inherent in the office.

"The cashier is the executive officer, through whom the whole financial operations of the bank are conducted.    He receives and pays out its moneys, collects and pays its debts, and receives and transfers its commercial securities.    Tellers and other subordinate officers may be appointed, but they are under his direction, as it were, the arms by which designated portions of his various functions are discharged."

Says the court in *Chemical National Bank* v. *Kohner,* 58 Howard Pr. 267, 270 :   "It appears to be conceded by all writers on this important subject of banks and banking, that a cashier is the business officer of a bank ; but only in the sense of one who transacts, and not of one who regulates or controls its affairs.    His duty has reference to daily routine business, and not to matters involving discretionary authority, which belongs, unless delegated, to the board of directors. As has been quaintly said, 'they are the mind and he is the hands of the corporation.'    Another likens the directors to the judges, and the cashier to the clerk, of a court.    The former adjudicate and direct ;   the latter executes their mandate.

"Such an officer, publicly acknowledged as such, is invested with such power as judicial sanction or banking usages have recognized and acknowledged as belonging to the office he holds, and it is for the court to decide whether or not any particular duty is within his authority."

"Cashiers of a bank are held out to the public," says the United States Supreme Court, speaking by Clifford, J., in *Case* v. *Bank,* 100 U. S. 446, 454, "as having authority to act according to the general usage, practice, and course of business conducted by such institutions; and their acts, within the scope of such usage, practice, and course of business, will in general bind the bank in favor of third persons 'possessing no other knowledge.'    *Minor* v. *Mechanics Bank of Alexandria,* 1 Pet. 46.    .    .    .

"Such an officer is *virtute officii* intrusted with the notes, securities, and other funds of the bank, and is held out to the world by the bank as its general agent for the transaction of its affairs within the scope of authority evidenced by such usage, practice, and course of business."

In *Olney, Receiver* v. *Chadsey*, 7 R. I. 224, 228, the Supreme Court of this State, speaking through Ames, C. J., said : "The president of a bank in Rhode Island has no authority, as such, to surrender or release the claims of the bank against anyone, and if he possesses such authority it is not *virtute officii*, but must be derived, as the jury were instructed, from the board of directors by their vote or from their assent, express or implied."

In that case the president was also the manager of the bank ; but we see no reason why the above statement is not equally applicable to a cashier, who is also the manager or executive officer of a bank.

The authorities conclusively show that, under ordinary circumstances, the cashier of a bank is authorized to allow a bank-balance to be drawn out. He can, of course, receive deposits, and the deposit-slips or tickets accompanying the deposit show on what account such deposits are received and how they are to be credited. In this case all deposits after the first one (with a single exception, where a deposit-ticket of the American Worsted Company was used by mistake) were made by the plaintiffs in the defendant bank upon a ticket in their names as assignees, and were entered in a pass-book issued by the bank's clerk, though such entry, it is declared, was without the knowledge of the cashier. The cashier knew, however, that deposits were so made on deposit-tickets, or he should have known, as he had abundant opportunity of knowing. He swore that he authorized the assignees to draw from the account of the American Worsted Company in their names, and the finding of the trial justice was that the cashier had agreed to the transfer of the whole account to the assignees' name, so that such action by the cashier, together with the possession of a pass-book in their name, which appeared to have been newly issued, undoubtedly led them to believe that

the account stood on the books of the bank just as it stood on the pass-book.

There is no question that the account was not transferred from the name of the American Worsted Company to the names of the assignees by check, though the finding of the trial justice establishes the fact that the cashier did agree to transfer the account, which finding of fact was correct, we think, from the weight of the evidence; and as said by the Supreme Court of Indiana in *McEwen et al.* v. *Davis*, 39 Ind. 109, 112: "The banks may pay the money upon an oral order, or transfer it from one account to another, and such oral order will be a sufficient authority and justification for so doing." See also *Neff* v. *Greene County National Bank*, 89 Mo. 581.

We have already referred to the equivocal position of Randall in this matter; let us briefly scan the position of the assignees.

The plaintiffs, as assignees of the American Worsted Company, knew, of course, that Randall was the treasurer of the insolvent company, for it held an assignment just executed by him as such. They knew, also, that he was the cashier of the defendant bank. They must have known, as it seems to us, for they had ample opportunity to know, that the bank held the assignor's notes indorsed by Randall. We say must have known—for they had possession of the assignor's books, and the evidence discloses that the former clerk of the assignor became their clerk, the assignor's treasurer was on friendly terms with them, and naturally, if they did not already actually know what of the assignor's paper was held by the bank, they, as business men, would have inquired when seeking to take possession of the assigned property that properly belonged to them; and they knew that, as to any paper made by the assignor that was due, the bank would be entitled to a lien *pro tanto* on its bank-deposit to secure the same, for of the three assignees present at the defendant bank on that 10th day of February, 1899, one was a trained lawyer, and then, too, they took with them another well-known lawyer as their legal adviser. The assignees took only what the assignor

could have taken, and if it was necessary to bring suit to reduce the bank-deposit to their own possession they must have brought suit in the name of the American Worsted Company. Knowing all these things, as they must have known them, they also must have known that Randall, being treasurer of the American Worsted Company and an indorser on its paper, was not a proper person to represent the bank in dealing with that company's deposit. For a cashier, representing the interests of the bank, to surrender or agree to surrender the deposit of a maker of overdue paper known to be insolvent would have been an astonishing act for a *disinterested* cashier to perform ; but such an act for a cashier with the environments of this one to be guilty of, rouses a strong suspicion that his other interests outweighed in his mind the interests of the bank that he was in duty bound to look out for if assuming to be then acting for the bank. It was his duty as cashier to protect the claim of the bank. If he, as treasurer, had drawn a check for more money than he was entitled to demand, and, as cashier, had paid it, knowing that it was drawn for a larger sum than the bank was under legal obligation to pay, the transaction would have been a fraud of the plainest kind, and the money could have been recovered from any one who took it with notice of the fraud ; and yet Randall's action in allowing so much of the assignor's deposit as the bank could properly claim a lien upon to be drawn out would be just as injurious to the bank.

However it might have been as to the note not then due, yet as to the two notes then overdue the assignees would be in no worse position than they were before if they do not recover the amount of those two overdue notes, for they have been guilty of no breach of duty as to the assigned estate, and they will suffer no loss by not getting what they had no right to expect to get. A cashier, according to the authorities, has no right to surrender security without the direction of the board of directors ; and though, technically, paying checks on a bank-deposit may not be surrendering security as giving up the possession of bonds or other collateral security or releasing indorsers would be, yet the result is the same when

the depositor has become so notoriously insolvent as to have made an assignment for the benefit of its creditors, and its assignees apply for the whole of the deposit for the very purpose of thwarting claims for liens and of removing the administration of the whole estate from the hands of the assignor.

As said by the Supreme Court of the United States, through Clifford, J., in *Case* v. *Bank, supra*, "Authorities to show that the acts of a cashier or other officer of a bank within the scope of the general usage, practice, and course of business of banking institutions, are binding on the corporation in favor of third persons transacting business with it are quite numerous, provided it appears that the persons dealing with the officer did not know at the time that he was transcending his authority. *Lloyd* v. *The West Branch Bank*, 15 Pa. St. 172; *The Bank of Vergennes* v. *Warren*, 7 Hill (N. Y.), 91; *Franklin Bank* v. *Steward*, 37 Me. 519, 522."

Whatever the relative weight of the argument as to whether under ordinary circumstances turning the deposit in question over to the assignees would not be technically a surrender of security, yet in the extraordinary circumstances of this case we think that the assignees, with their knowledge, must be held to have known that Randall was transcending his authority, and hence they were not justified in dealing with him as cashier, but should have resorted to the directors, who, it appears by the existence of this suit, repudiate any action of their cashier tending to release the deposit from claim of lien.

We do not think the plaintiffs are entitled to recover as to so much of said bank-deposit as is required to pay the notes of the American Worsted Company held by the defendant bank that were overdue on said 10th day of February, 1899.

We think, however, the case was different as to the note not then due. It was the plain duty of the cashier, as it would have been of the directors of the bank, to have allowed the transfer of the deposit so far as said note not due on or before February 10th, 1899, was concerned, for the bank then had no claim for lien on the deposit for that note, and

could not have pleaded that note as a set-off, for Gen. Laws R. I. cap. 239, § 11, provides that the demand a defendant may set off must be one "which existed at the time of the commencement of the action and then belonged to the defendant in his own right and for which he might maintain a suit in his own name." See also *Nightingale* v. *Chafee*, 11 R. I. 609, 620.

It was the duty of the plaintiffs, as assignees under the deed of assignment, to reduce the assets of the assigned estate into possession, and the way to do it as to this deposit was either to withdraw the deposit from the defendant bank, or else to have it transferred out of the name of the assignor and into their own names, so as to have prevented the accruing of liens upon it. *Tobey et al.* v. *Manufacturers National Bank*, 9 R. I 236, 239. The action of the cashier in leading them to believe, until after the maturity of the third note, that said deposit had been transferred to their names, prevented their suing the bank for it when it had no lien upon the deposit for the amount of that note, whereby the assignees, or the creditors of the estate they represented, suffered loss.

While we think that the wrongful act of the cashier should not be allowed to enure to the injury of the bank in regard to the overdue notes, we also think that the bank should not be allowed to reap any advantage by their repudiation of the conduct of their cashier, so far as such conduct was proper and did not militate against the bank's interests, and which repudiation would enure to the detriment of the plaintiffs as assignees. If the directors themselves, on February 10, 1899, had refused to transfer the deposit so far as the unmatured note was concerned, the bank could have been compelled to pay said deposit, *pro tanto*, by a suit brought against it in the name of the American Worsted Company ; and what it would have been the plain duty of the directors to have done in regard to said deposit cannot be repudiated now because done by the cashier, his action as to so much of said deposit not being in dereliction of his duty.

In our opinion the plaintiffs are entitled to recover a sum equal to the amount of the note made by the plaintiffs' as-

signor and held by the defendant bank on February 10, 1899, but which had not then matured, with interest thereon from said last-mentioned date.

Judgment for the plaintiffs for $2,817.09, with costs.

*Walter H. Barney*, for plaintiffs.

*Cooke & Angell and Erwin J. France*, for defendant.