## NEW AMSTERDAM CASUALTY CO. v. FIRST NAT. BANK IN OKLAHOMA CITY et al.

No. 19424. Opinion Filed April 29, 1930.

Rehearing Denied July 8, 1930.

Commissioner's Opinion, Division No. 1.

Nowlin, Spielman & Thomas, for plaintiff in error.

Wilson & Wilson, for defendants in error.

BENNETT, C. This action was brought in district court of Carter county, Okla., by New Amsterdam Casualty Company, a corporation, plaintiff, against First National Bank of Oklahoma City, Okla., and American National Bank of Ardmore, Okla., defendants, and the parties will be referred to as plaintiff and defendants in the same order as they appeared in trial court.

Plaintiff, who was surety on the official bond of S. F. Haynie as county treasurer of Carter county, sought to recover from defendants upon the theory that they negligently participated and aided in the wrongful diversion of county funds of said county by said treasurer. It is alleged that during his term said officer misappropriated about $100,000 of the county's money, and that thereafter said county recovered judgment therefor on said bond, which plaintiff was compelled to and did satisfy, and that plaintiff, as surety, is subrogated to the rights of the county.

The general demurrer of defendant First National Bank was sustained as to plaintiff's third amended petition, upon which plaintiff elected to stand. Whereupon the action was dismissed as to such defendant only, and plaintiff appeals. The action of the court on this demurrer is the only error alleged.

The correctness of this ruling involves the consideration at length of the petition, which, in substance, alleges that plaintiff is a corporation doing business in Oklahoma and authorized to write fidelity bonds; that defendants are national banks in this state; that S. F. Haynie was county treasurer of Carter county, Okla., from June 1, 1923, to July 1, 1925, and plaintiff became surety on his treasurer's bond, which was conditioned as required by law; that during said term of office, said treasurer, Haynie, violated the terms of said bond and embezzled $75,000 of the funds of said county. Whereupon commissioners of said county sued on said bond, and thereafter recovered judgment for $81,461.05 against plaintiff, as surety, April 19, 1927, in district court of Carter county, Okla., (a copy of said judgment is attached to and made part of plaintiff's petition); that, on April 19, 1927, plaintiff paid to county commissioners of Carter county said judgment, by reason whereof plaintiff is subrogated to the demands of Carter county against defendants; that during the term of office of said county treasurer defendant Exchange National Bank

of Ardmore, Okla., was duly desigated as a depository for county funds for such county, but that said bank failed to qualify as such depository for the deposit of the $75,000 herein referred to, but received same as shown herein; that First National Bank of Oklahoma City was never designated and never qualified as depository for said county funds.

It is alleged that said county treasurer unlawfully embezzled $75,000 of said county funds, and that said banks unlawfully and negligently aided in such misappropriation in the following manner: Said treasurer deposited in First National Bank of Oklahoma City moneys of said county as follows: January 20, 1925, $7,791.02; February 24, 1925, $43,666.76; March 9, 1925, $39,332.28; said moneys being deposited in the name of S. F. Haynie, county treasurer, account (reopened); that by receiving said deposits in violation of law, said bank acted in collusion with said treasurer, and thus aided him in the embezzlement of said $75,000, in that said bank was not on said date a duly designated depository of Carter county, and had not furnished to said county commissioners any security for such deposit as required by law, and by reason whereof said banks owed said county the duty of exercising the highest and utmost care with respect to said fund; that, on April 12, 1925, said First National Bank accepted from said treasurer a bogus check payable to S. F. Haynie for said county funds then in its hands for $81,461.05; that said check did not show upon its face the purpose for which it was drawn, nor was it drawn on any warrants of the county commissioners, nor in payment of any lawful claims duly verified as required against Carter county; that said First National Bank issued in exchange for said check two cashier's checks on said bank aggregating the same sum payable to S. F. Haynie, county treasurer; that the fact that said $81,461.05 check was payable to S. F. Haynie individually was notice to said bank that a misappropriation of said sum of money was contemplated by said treasurer; that the bank, by issuing such cashier's checks, was grossly negligent and careless, and same resulted in the loss of said funds to said county; that soon after securing said cashier's checks, said Haynie indorsed the larger one ($75,000) to Exchange National Bank of Ardmore in exchange for a cashier's check for a like sum payable to one E. G. Lewis, who collected and used the proceeds thereof; that Exchange National Bank of Ardmore was at said time one of the regularly designated depositories of Carter county; that said Ex-

change National Bank, knowing that said funds were county funds, and that Haynie was endeavoring to misapply the same did wrongfully and carelessly issue to said Haynie its cashier's check payable as aforesaid to E. G. Lewis, whom it well knew was not entitled to receive same, and that thereafter the said Haynie forwarded said cashier's check to payee in California, and the proceeds thereof became lost to Carter county; that but for the negligent and tortious conduct of Exchange National Bank, said embezzlement could not have been consummated.

It is further alleged that First National Bank of Oklahoma City violated its duty to Carter county in that it did not give notice to county clerk of Carter county on the first Monday of each month showing the $75,000 on hand belonging to Carter county at the close of business each day during the previous month, together with the interest accrued thereon, all as provided by law, and that said bank profited by said transaction in paying no interest upon said deposit, and that but for the negligence of said First National Bank of Oklahoma City the embezzlement of Haynie could not have been consummated.

In addition to a copy of the judgment in Carter County v. Haynie and New Amsterdam Casualty Co., No. 15154, the following exhibits are attached to the petition:

"Exhibit B.

"No. ———

"Office of Treasurer of Carter County. Oklahoma, Ardmore, Oklahoma, 4-13-1925. Original. Pay to the order of S. F. Haynie $81,461.05, Eighty-one Thousand Four Hundred Sixty-one and 05/100 Dollars, for— Warrants Nos. 1. To First National Bank, Oklahoma City. Oklahoma.

"S. F. Haynie, Treasurer
"Deputy.

"(Indorsements on back): Pay to the order of any bank or banker, prior indorsements guaranteed, April 13, 1925. First National Bank Successors to State National Bank, Oklahoma City, R. L. Smith, Cashier, No. 402.                                    39-1

"Exhibit C.

"First National Bank, United States Depository, 39-1. Oklahoma City, Okla., Apr. 13, 1925, No. 110168. "Countersigned: Etta Delman, Teller. Pay to the order of S. F. Haynie, Co. Treas., $75,000, exactly Seventy-five Thousand Dollars Exactly. Cashier's check.

"Lyal Barnhart, Cashier.

"(Indorsements on back): Pay to Ex-change National Bank, Ardmore, Okla., or order, S. F. Haynie, county treasurer, Carter County, Okla., American National Bank, Clearing House, April 18, 1925. Prior indorsements guaranteed. Oklahoma City, Oklahoma.

"Pay to the order of any bank or trust co., Apr. 17, 1925. All prior indorsements guaranteed. Exchange National Bank, Ardmore, Okla.

"Exhibit D.
"86-57.

"Exchange National Bank of Ardmore, Ardmore, Okla., April 17, 1925. No. 21023. Pay to the order of E. G. Lewis $75,000. Exactly. Exactly Seventy-five Thousand Dollars, Exactly. Exactly. Exactly. Cashier's check.

"Lee L. Tyer, Cashier.

"(Stamped on face): Exchange National Bank, Paid through Clearing House, Apr. 30, 1925, Indorsements guarantee. Ardmore, Okla.

"(Indorsements on back); E. G. Lewis, pay any bank or banker or order, Coll. No. 30371, Commerce Trust Co., Kansas City, Mo.

"E. P. Wheat, Cashier.

"Pay to the order of any bank, banker, savings or trust company. All previous indorsements guaranteed. San Luis Obispo Branch, Pacific Southwest Trust & Savings Bank. 90-326. San Luis Obispo 90236. Calif.

"Francis Throop, Cashier.

"Pay to the order of any bank or banker for collection. 14. Apr. 24, 1925. 14. The First National Bank, Los Angeles, Calif., 16-3.                                    16-3.

"W. R. Lutz, Cashier."

We will restate a few of the most vital facts: Between January 20, 1925, and March 9, 1925, S. F. Haynie, county treasurer of Carter county, deposited to his credit as such officer in First National Bank of Oklahoma City over $90,000. Said bank had not qualified as a depository for such public funds and did not report same to county clerk. April 13, 1925, said county treasurer delivered to said bank a check upon the county treasurer's official form payable to S. F. Haynie for $81,461.05, purporting on its face to be for warrants No. 1, in consideration whereof said bank issued its two cashier's checks, one for $75,000, the other for $6,461.05, payable to the order of S. F. Haynie, county treasurer. The $75,000 cashier's check was indorsed by S. F. Haynie, county treasurer of Carter county, Okla., to Exchange National Bank, Ardmore, Okla., in exchange for its cashier's check for like amount payable to the order of E. G. Lewis.

Both the $75,000 items were promptly paid.

Plaintiff discussed: First, the interpretation of the depository statutes of Oklahoma; and second, it urges that First National Bank had knowledge from the facts that the county treasurer was seeking to embezzle the funds of the county, and that the bank actively aided in the enterprise of defrauding the county. We prefer to discuss the matter in the reverse order.

Some preliminary statements of the doctrine applicable to banks and depositors may be laid down for our guidance in the consideration of this question.

"The bank is under the obligation of honoring the customer's drafts and checks whenever the same are presented for payment, provided that at the time of such presentment the balance of the account, if then struck, would show a credit in favor of the customer of funds, on which the bank has no lien, sufficient to meet the sum called for by the check or draft. The contract so to honor the depositor's orders is implied from the usual course of business. The deposit is made with the tacit understanding that the bank shall respond to the depositor's orders, so long as there is sufficient balance to his credit." Morse on Banks & Banking (6th Ed.) pp. 720-721, sec. 311.

This universal rule is supported by many cases cited in the notes under the foregoing paragraph of Morse. At page 725, sec. 313, the same author says:

"The order is almost always expressed in writing, by check or otherwise. But there is no absolute necessity for this. An oral direction from the customer to the bank to pay a sum, or to transfer a credit, would fully justify the bank in so doing. If the bank itself is willing to act upon an oral order, this would be a perfect defense to a suit by the depositor for the amount transferred under it." Citing Ellis v. First National Bank, 22 R. I. 565, 48 Atl. 936 (1901); Whitsett v. People's National Bank, 138 Mo. App. 81, 119 S. W. 999 (1909); Newmark Grain Co. v. Merchants' National Bank, 166 Cal. 203, 135 Pac. 958.

Paragraph 317 of said authority deals with the bank's duty as to trust funds as follows:

"**Banker cannot inquire into third person's affairs, nor refuse to pay a check merely because he is aware of an intended breach of trust.** The banker cannot excuse his disobedience of his customer's orders, in the due course of business, by setting up that he knew, or had reason to believe, that the customer's order was given in promotion of an unlawful purpose. For example, the banker is not justified in refusing to honor the depositor's check because he knows or believes that the check is an appropriation of funds to a person or for a purpose to whom or for which the depositor is not lawfully authorized to appropriate these funds." Citing numerous cases under notes 2 and 3.

Proceeding, the author says:

" 'Supposing that the banker becomes incidentally aware that the customer, being in a fiduciary or a representative capacity, meditates a breach of trust, and draws a check for that purpose, the banker, not being interested in the transaction, has no right to refuse the payment of the check, for if he did so, he would be making himself a party to an inquiry as between his customer and a third person.' "

Of course, if the depositor sought to pay his own debt to the banker by an appropriation of funds to his credit in a fiduciary capacity with the banker, then the banker would be affected with knowledge of the misappropriation.

In the case of Gray v. Johnson, L. R. 3 Eng. & Ir. App. Cas. 1, in which an executrix, by a check signed by her as such, in favor of a mercantile firm of which she was a member, drew out of a bank a fund belonging to the estate, the Lord Chancellor, after a discussion as to how serious it would be to permit bankers upon trifling grounds or a mere suspicion to refuse to honor a check drawn by their customer, and, on the other hand, how serious it might be if bankers insisted upon paying out trust moneys when they knew it was to be misapplied, stated the rule thus:

"In order to hold a banker justified in refusing to pay a demand of his customer, the customer being an executor, and drawing a check as an executor, there must, in the first place, be some misapplication—some breach of trust—intended by the executor, and there must, in the second place, as was said by Sir John Leach in the well-known case of Keane v. Roberts, be proof that the bankers are privy to the intent to make this misapplication of the trust funds. And to that I think I may safely add that if it be shown that any personal benefit to the bankers themselves is designed or stipulated for, that circumstance, above all others, will most readily establish the fact that the bankers are in privity with the breach of trust which is about to be committed."

Lord Westbury, in another opinion in that case, made this statement:

"The relation between banker and customer is somewhat peculiar, and it is most important that the rules which regulate it should be well known and carefully observed. A banker is bound to honor an order of his customer with respect to the money belonging to that customer which is

in the hands of the banker; and it is impossible for the banker to set up a jus tertii against the order of the customer, or to refuse to honor his draft, on any other ground than some sufficient one resulting from an act of the customer himself. Supposing, therefore, that the banker becomes incidentally aware that the customer, being in a fiduciary or a representative capacity, meditates a breach of trust, and draws a check for that purpose; the banker, not being interested in the transaction, has no right to refuse the payment of the check, for, if he did so, he would be making himself a party to an inquiry as between his customer and third persons. He would be setting up a supposed jus tertii as a reason why he should not perform his own distinct obligation to his customer. * * *"

This doctrine is followed in Dempsey Oil & Gas Co. v. Citizens' Nat. Bank, 110 Okla. 39, 235 Pac. 1104; Southwestern Surety Ins. Co. v. Marlow, 78 Okla. 313, 190 Pac. 672; Havana Cent. R. Co. v. Central Trust Co., 204 Fed. 546; Merchants & Planters Bank v. Meyer, 56 Ark. 499, 20 S. W. 406; Goodwin v. Amer. Nat. Bank, 48 Conn. 550; Central Nat. Bank v. Ins. Co., 104 U. S. 54, 26 L. Ed. 693. In Interstate Nat. Bank v. Claxton (Sup. Ct. of Tex.) 80 S. W. 604, the court goes the limit as may be seen by paragraph 2 of the syllabus as follows:

"A depositor, though holding money in a fiduciary capacity, may draw it out of the bank at his pleasure, and the bank is bound to honor his checks, and incurs no liability in so doing so long as it does not participate in any misappropriation of funds or breach of trust, though the conduct or course of dealing of the depositor may charge the bank with notice that he is violating his trust."

The same general rule is recognized in First State Bank of Bonham v. Hill (Tex. Civ. App.) 141 S. W. 300.

In the case of Duckett v. Nat. Mechanics' Bank of Baltimore, 86 Md. 400, 38 Atl. 983, a part of the opinion is as follows:

"It is immaterial, so far as respects the duty of the bank to the depositor, in what capacity the depositor holds or possesses the fund which he places on deposit. The obligation of the bank is simply to keep the fund safely and to return it to the proper person, or to pay it to his order. If it be deposited by one as trustee, the depositor, as trustee, has the right to withdraw it, and the bank, in the absence of knowledge or notice to the contrary, would be bound to assume that the trustee would appropriate the money, when drawn, to a proper use. Any other rule would throw upon a bank the duty of inquiring as to the appropriation made of every fund deposited by a trustee or other like fiduciary; and the imposition of such a

duty would practically put an end to the banking business, because no bank could possibly conduct business if, without fault on its part, it were held accountable for the misconduct or malversation of its depositors who occupy some fiduciary relation to the fund placed by them with the bank."

In accord with the principle is City of Helena v. First Nat. Bank of Helena (Ark.) 292 S. W. 140. In that case the city treasurer deposited funds and taxes in his individual name and drew out same by his individual checks. The bank knew the facts, knew that the deposit was trust funds, but made no attempt to see that the funds were paid out to those having legal demands against the city. Upon investigation the treasurer's account was $50,000 short. The court, in the opinion, says:

"The general principle governing the bank's liability is that the officers of the bank, who know that a fund on deposit is a trust fund, cannot appropriate that fund to the private benefit of the bank, or, where charged with notice of the conversion of the trustee, participate with him in appropriating it to his own use, without being liable to refund the money, if the appropriation is a breach of the trust. Allen v. Puritan Trust Co., 211 Mass. 409, 97 N. E. 916, L. R. A. 1915C, 518, and Blanton v. First Nat. Bank of Forrest City, 136 Ark. 441, 206 S. W. 745."

The court at page 142 of 292 S. W., says:

"It is sought to hold the bank liable on the theory that the attendant circumstances charge it with the knowledge that Myers was misappropriating the funds of the city. As we have already seen, the deposit by a trustee of funds belonging to the trust estate in his individual name and account at the bank is not a conversion of the trust fund. * * * It is insisted that the bank must have seen to the proper application of the funds, because it allowed Myers to deposit them in his individual name, and to check them out that way. We do not think that this was sufficient to put the bank upon inquiry and to charge it with knowledge that Myers was misappropriating the funds belonging to the city."

And in the opinion a quotation from Bischoff v. Yorkville Bank, 218 N. Y. 106, 112 N. E. 759, is made, part of which is:

"'Although the depositor is drawing checks which the bank may surmise or suspect are for his personal benefit, it is bound to presume, in the absence of adequate notice to the contrary, that they are properly and lawfully drawn. Adequate notice may come from circumstances which reasonably support the sole inference that a misappropriation is intended, as well as directly.'"

To the same effect see Whiting v. Hudson

Trust Co., 234 N. Y. 394, 138 N. E. 33.

Applying these legal principles now to the acts and conduct of the parties at the crucial time when misconduct of the bank, if it ever existed, showed itself—when it issued the cashier's check—why could not the bank pay out this money to the one from whom it had received it and in the same capacity? It is argued that the check of the treasurer payable to himself individually was a suspicious circumstance. Waiving the simple explanation that it probably appeared then only an inadvertence, did not the bank act as prudently as if it had been put on guard by making its checks payable, not to the treasurer individually, but to him in his full official capacity? Conceivably these deposits in the bank were made by the treasurer in currency. In that form the funds could have been concealed, sent through the U. S. mails, by express, or simply handed to a friend. When restored to the treasurer by cashier's check, they bore the earmarks of a trust fund which could not be misappropriated without a wanton act entirely independent of and subsequent to any act of the bank in issuing its cashier's check.

Under the authorities: "A bank may pay out money upon oral order." Suppose this treasurer had orally requested that the bank issue to him individually a certified check and the bank had said: "We can't do that; this fund stands in your name as county treasurer." If the county treasurer had then responded: "All right; make it out to me as county treasurer;" could it be said that such circumstance was so suspicious as to warrant the bank in refusing to honor the check properly made out to its depositor? Is not that just what happened in this case except that the demand was in writing, and in response thereto, did not the bank, in effect, refuse to make out the check to him individually, but, in fact, made the same to him as county treasurer? To give this circumstance the meaning claimed by plaintiff, the county treasurer could never have drawn out this fund either individually or officially, for he would have been met by the statement of the bank: "You have asked me to make this check to you individually, which is notice to me that you wish to embezzle the fund." That reason would be as potent a year after the statement as it was at the time it was made. If the suggestion were a sufficient warning, we repeat, the bank heeded the same and pursued the prudent course of making its check to the treasurer in his official capacity.

Again, chapter 88, S. L. 1925, p. 138, amending section 5727, C. O. S. 1921, providing for the first time that excess funds over the limitation which a resident bank of such county may lawfully hold were authorized to be deposited with the State Treasurer, had just become effective a few days prior to the issuing of the cashier's check; would not the bank have been justified in concluding that the deposit was being changed under the provisions of said act?

It is next argued that the purpose of the check was not made known to the bank. On the face of the formal official check and at the appropriate place appear the words: "For warrants Nos. 1." That certainly made the check appear regular in every respect. If it had been filled in for the payment of a judgment against the county with the number and style of the case, the bank would have had no time to verify the existence of the parties and the judgment and its nonpayment. Was there anything on the check to indicate that if the bank did not inquire whether there was a warrant No. 1 outstanding that it would be guilty of a participation in embezzlement of $75,000 of county funds? Was there anything on the face of these papers that would indicate that the county treasurer was an embezzler, and that the bank, which had received at his hands, as county treasurer of the county, these funds, should withhold payment, and subject itself to pains and penalties for refusal to pay a depositor who had money on hand?

The deposit of money in bank creates a rather peculiar relation. Some cases have held that it is similar to a loan; to others the transaction appears a bailment; still others hold the relation that of debtor and creditor only. Certainly the First National Bank did not become a cotrustee of this fund. It had the use of it; in fact, it was its money, subject only to the right of the county treasurer to check it out in such amounts and at such time as he desired to do so. Plaintiffs disclaim the thought that the bank acquired any part of the proceeds of these checks made payable to the county treasurer, but it is contended that the bank profited by the transaction because it did not pay the county interest on the deposit. There is no apparent connection between the liability, if any, for the interest on this deposit, and this gross abuse of confidence by the county treasurer wherein he embezzled funds of the county.

It is contended also that no one save the county commissioners could authorize the purchase with county funds of these cashier's checks. It is too clear for argument that

the bank was simply paying to its depositor the moneys held there subject to his check. It is conceded by plaintiff that defendant's negligence, if any, did not, in itself, produce the loss; that it remained for the Ardmore bank to convert the cashier's check into an instrument not subject to identification as county funds. The First National Bank had the right to pay its depositor in cash, exchange, or by cashier's check as best suited its depositor. We might ask, when did the act of this bank become fraudulent? Was it when it returned to its depositor the exact sum of money it held for his benefit? Could the county have sued then for diversion of the money? Or was it necessary that the county treasurer go back to Ardmore and have another bank change the cashier's check from one payable to him officially into one to himself or another individually before defendant's wrong became complete? What made it complete? How could the defendant have paid its depositor without making it easier for the county treasurer to embezzle the fund? Of course, he could not embezzle it so long as it was in the bank, but the bank could not hold it forever. If it had paid him in currency he could have spent the money, or given it away, or applied it to personal debts. But when the treasurer returned to Ardmore, he had an instrument which is generally held the equivalent of money bearing on its face the earmarks and indicia of trust funds belonging to the county. There is no intimation in the petition that First National Bank ever heard of E. G. Lewis, or any dealings between him and said treasurer, or knew that any bank at Ardmore or elsewhere would issue in lieu of the cashier's check payable to the county treasurer a check payable to a stranger to Carter county.

It is next contended that the bank made itself liable by accepting these deposits without giving bond or furnishing security. These requirements are simply to assure the return of public funds to those entitled to them without loss or delay. They were so returned. It is nowhere alleged that the bank was insolvent, or unable to respond, but the petition shows that it did respond, and the only complaint now is that it should not have responded to the demands of the trusted and bonded public official of said county. If said bank received these deposits when it should not have done so, should it not be accorded a locus penitentii? Might it not make amends by returning the funds to the officer from whom it received them?

Plaintiff's action is predicated upon tort. We think the failure to pay interest and to make report on the first Monday in the two months following said deposits showing the amount on hand and interest accrued in favor of the county has little to do with the vital merits of this controversy. It is urged by defendants that plaintiff is not entitled to subrogation under the peculiar allegations in this case. Under our view it is not necessary to consider this position.

Upon consideration of the entire petition and the exhibits thereto, we conclude that the petition did not state a cause of action in favor of plaintiff and against the defendant First National Bank, for which reasons the judgment of the trial court is affirmed.

TEEHEE, REID, HERR, and FOSTER, Commissioners, concur. HEFNER, J., disqualified and not participating.

By the Court: It is so ordered.