FOURTH NATIONAL BANK OF TULSA v. BOARD OF COM'RS OF CRAIG COUNTY et al.

*95 P. 2d 878.*

No. 28249.    Sept. 19, 1939.

Rehearing Denied Nov. 14, 1939.

Application for Leave to File Second Petition for Rehearing Denied Nov. 28, 1939.

Chas. L. Yancey, G. C. Spillers, and John S. Carlson, for plaintiff in error.

Frank L. Haymes, Nathan A. Gibson, and Wilbur J. Holleman, for defendants in error.

OSBORN, J. This is an appeal by the Fourth National Bank of Tulsa, Okla., a national banking association, defendant in the lower court, from a judgment of the district court of Tulsa county rendered against said bank and in favor of the board of county commissioners of Craig county and the United States Fidelity & Guaranty Company, a corporation, plaintiffs in the lower court, for the conversion of certain bonds. The plaintiffs in the lower court prosecute a cross-appeal.

Upon trial without a jury the district court first rendered judgment against said bank for the total par value of the bonds alleged to have been converted, and further decreed that upon payment of the judgment the bank was entitled to the return of three specified Sapulpa funding bonds in the possession of the county. But thereafter the court modified its judgment by deducting a certain cash item and by ruling that the proper measure of damages for conversion of the bonds was the highest market value of said bonds between the date of conversion and the date of judgment rather than the par value thereof as set forth in the first judgment. Making deductions in accordance with these rulings, the court rendered final judgment against the bank in the sum of $16,430.17. The defendants in error, plaintiffs below, appeal from these two rulings of the court in modifying the judgment. Since this appeal involves the application of the equitable doctrine of subrogation, it is necessary that we carefully review the evidence, which is, in the most part, undisputed.

On June 13, 1933, E. M. Landrum, county treasurer of Craig county, accompanied by R. J. Hutchman, a bond dealer, deposited certain municipal and county bonds with the defendant bank, located in the city of Tulsa, Tulsa county, for safekeeping. The bonds were of the total par value of $24,000. Landrum also left two bonds, par value $1,000 each, maturing at an earlier date, with said bank for collection upon maturity. All of these bonds were sinking fund investments of Craig county and a school district of that county whose funds were under the control of said treasurer.

Soon after the bonds were so deposited with the bank, Hutchman asked to withdraw certain of the bonds and exchange them for others. The bank refused to comply with Hutchman's request at the time, but on June 15, 1933, Landrum instructed the bank by telegram to make the exchange. Thereafter, on June 21, 1933, Landrum wrote a letter to the bank advising it that he had deposited these bonds in order to facilitate exchanging them for other securities and that Hutchman would handle the matter for him with the bank. Following these communications, the bank co-operated with Hutchman in exchanging the bonds. The money collected on maturity of the two bonds above referred to was used to purchase other bonds. After all of the original bonds except two had been exchanged for other bonds, the bank sent the substitute bonds

104

and the two remaining original bonds to the county treasurer, Landrum.

On September 4, 1933, subsequent to the date the bank forwarded the substitute bonds to the county treasurer, the board of county commissioners of Craig county, at the request of Landrum, the county treasurer, passed the following resolution:

"Be it resolved by the Board of County Commissioners that the purchase by the County Treasurer of $10,000.00 of Tulsa City Street Improvement Bonds and $18,000.00 City of Sapulpa Funding Bonds at par and accrued interest be and the same is hereby approved."

The bonds referred to in this resolution are of the same issues as those bonds which the bank had obtained in the exchange of securities as instructed by Landrum. At the trial Landrum testified that he placed these bonds which he had received from the bank in exchange for the original sinking fund investments before the county commissioners and they passed the above resolution approving the exchange of bonds. But Mr. Friend, chairman of the board, denied this, stating that at the time the resolution was passed the commissioners had never seen the bonds and did not know an exchange of bonds had already been made.

In 1935, an audit of County Treasurer Landrum's accounts revealed a total shortage of $39,310.66. The audit disclosed that the bonds which had been deposited with the defendant bank and subsequently exchanged for other securities were still carried on the books as sinking fund investments. The bonds obtained in the exchange had never been entered in the sinking fund investment account of either the county or the school district. Landrum's defalcations were as follows:

"Craig County Sinking
   Fund                    $16,000.00
"School District Sinking
   Fund                     20,986.55
"Cash collections, etc.,     2,324.11"

The only bonds involved in the exchange made by the bank found by the auditors and county officials were the two original bonds which the bank had returned to Landrum with the bonds obtained in the exchange, three City of Sapulpa funding bonds which were among the substitute bonds procured by the bank in the exchange, and five bonds which the treasurer had deposited with the bank and had been in turn exchanged for other bonds but in some unexplained manner were back in the possession of the treasurer. The total par value of the sinking fund bonds which had been deposited with the bank found in the possession of the county was $7,000. The par value of the Sapulpa bonds was $3,000.

After the shortage was discovered the county commissioners of Craig county brought suit against the United States Fidelity & Guaranty Company, Landrum's surety, for the total amount of the shortage, but a compromise judgment was entered in the action for the sum of $34,000, which was immediately paid. As soon as the United States Fidelity & Guaranty Company was notified of Landrum's defalcation, its agents immediately located Hutchman and obtained from him $22,500 in bonds and $7,200 in cash. The bonds were sold for $10,059; so that the surety recovered a total of $17,259 on its loss as Landrum's surety.

After the compromise judgment was paid by the surety reimbursing the county for part of its losses occasioned by Landrum's shortage, this action was instituted against the bank. The petition, in substance, pleads a cause of action in favor of the surety against the bank upon the principle of subrogation. The petition does not state a cause of action against the bank in favor of the county; consequently, the county cannot recover in this action, but it is necessary to consider any remaining rights which the county might have against the bank, under the evidence, in order to properly apply the principle of subrogation to the particular facts herein. We shall deem the county properly before the court for that purpose.

It will be noted from the statement of facts above that the plaintiff in error, the Fourth National Bank of Tulsa, was in no manner involved in the peculations of Landrum, the county treasurer, which occurred subsequent to the exchanging of the bonds. Those peculations are unrelated to the question of the bank's liability.

The plaintiff in error bank argues its assignments of error under three propositions. The first proposition is as follows:

"The bank is not responsible for any loss because its acts in no way contributed to the loss and it had properly returned full value to the county treasurer of Craig county in bonds and money of equivalent value prior to the occurrence of any loss by Craig county."

The substance of the first part of this assignment, as argued by counsel, is that there is no causal connection between the bank's act in exchanging the sinking fund bonds deposited with it for other bonds and the ultimate loss to the county by reason of the subsequent peculations of the county treasurer, Landrum. It is true there is no connection between the two, but the question herein is whether the bank became liable to the county by reason of exchanging the bonds. In determining this question we shall consider only those transactions which took place up to and including the delivery of the exchanged bonds to the county treasurer by the bank.

A county treasurer may invest the sinking fund monies in certain designated securities, but "before any such investment shall be made by the treasurer of any county * * * such investment shall be approved by an order of the county commissioners and county attorney at a regular session of said board." Section 5914, O. S. 1931, 62 Okla. St. Ann. § 541. After such investment has been made, the securities so purchased can be sold only as provided by section 5918, O. S. 1931, 62 Okla. St. Ann. § 542, which provides:

"The Governor of the state of Oklahoma, the mayor and common council or the city commissioners of any city, the board of county commissioners of any county, the board of trustees of any township, town, school district, or the board of education of any city or other school district within the state of Oklahoma, when deemed by them to be to the best interest, is hereby authorized and empowered to sell any or all of the securities purchased in accordance with the provisions of section 1 (8572, C. O. S.) hereof at any time it may be to the interest of their respective municipalities so to do; provided, in no event shall any of such securities be sold for less than par and accrued interest."

In construing the foregoing statutes this court has uniformly held that where the county treasurer exchanges sinking fund investments for other securities he and his surety are liable for the value of the original sinking fund securities so converted, even though the securities for which the original sinking fund investments were exchanged are in the possession of the county and are equal in face value to that of the original securities, because the county treasurer does not have authority to sell, barter, or exchange the securities in which the sinking fund monies have been invested. The power to sell is vested in the board of commissioners by section 5918, supra. National Surety Co. v. State for the Benefit of Comanche County, 111 Okla. 180, 239 P. 257; National Surety Co. v. State ex rel. Richards, 111 Okla. 185, 239 P. 262; State v. McCurdy, 115 Okla. 111, 241 P. 816; Sanders v. Board of County Commissioners, 160 Okla. 52, 15 P. 2d 818.

Under the foregoing decisions, exchanging the sinking fund investments in violation of section 5918, supra, constituted conversion by the bank and county treasurer, and by reason of said conversion they became liable to the county for the value of the original sinking fund securities. According to the above cited authorities the converters are entitled to the return of the securities obtained in the exchange, if in the possession of the county, upon reimbursing the county for the original securities. We

shall determine the proper measure of damages when we consider the cross-appeal of the defendants in error.

It is not necessary, therefore, that any causal connection be established between the bank's act of exchanging the sinking fund bonds in violation of section 5918, supra, and the subsequent defalcations of the county treasurer, since these are unrelated matters. It was the conversion of the securities by exchanging them for others by the bank, and not the subsequent acts of Landrum and Hutchman in appropriating the bonds obtained in the exchange to their personal use and benefit, that caused the loss to the county which concerns us on this appeal. This loss was merely discovered at the same time unrelated peculations by Landrum, the county treasurer, were disclosed by an audit of his official accounts.

Counsel for plaintiff in error bank contend that the exchange of bonds was ratified by the board of county commissioners by passing the resolution of September 4, 1933, several months after the transaction was consummated, authorizing the county treasurer to sell a certain amount of sinking fund investments and purchase certain other bonds. This contention is without merit for several reasons: First, it is obvious the board of county commissioners could not ratify the action of the county treasurer in disposing of the school district sinking fund bonds, being the City of Muskogee board of education bonds of the total par value of $9,000, since these bonds were the property of the school district and only the board of that school district could authorize the sale of the bonds. Section 5918, supra. As to the bonds which were the property of the county, according to Landrum's instructions to the bank, an exchange of bonds was to be made, and neither the treasurer nor the county commissioners had the power to make or authorize such an exchange. State v. McCurdy, supra; National Surety Co. v. State, for Benefit of Comanche County, supra; National Surety Co. v. State ex rel. Richards, supra. However, if we deem the bank to have sold the deposited

bonds and purchased other bonds as distinguished from an exchange of bonds, then such a sale was void, since section 5918, supra, provides that sinking fund investments cannot be sold for less than par and accrued interest and all of said bonds were sold for less than par and accrued interest. Such acts in violation of a positive statute are void and cannot be ratified. School District v. Stanley, 136 Okla. 14, 275 P. 1042. Furthermore, the chairman of the board of county commissioners testified positively that the resolutions relied upon were not passed for the purpose of ratifying this transaction; but that in fact the commissioners did not know such a transaction had been made.

Counsel for the bank rely upon the cases of New Amsterdam Casualty Co. v. First National Bank, 144 Okla. 180, 289 P. 749, and New Amsterdam Casualty Co. v. First Nat. Bank, 154 Okla. 74, 6 P. 2d 779. In these cases the court held the bank was not liable to the county, or by subrogation to the surety of the official causing the loss, where the county treasurer wrongfully deposited county funds to his credit as county treasurer with the defendant bank, which was not an official depository, and subsequently withdrew the money from the bank by cashier's check and embezzled the money. The situation is clearly distinguishable from the instant case. If the bank herein had returned the original bonds deposited with it to Landrum, the county treasurer who had deposited said bonds, the above cases might be applicable. The trial court herein properly recognized the rule in the above cases by refusing to render judgment against the bank for those bonds deposited with it which were returned to the county treasurer by the bank or found in the possession of the county when the audit was made.

The second proposition advanced by the plaintiff in error bank is that the surety company is not entitled to be subrogated to the rights of the county because the equities in favor of said surety are not superior to those of the bank. This contention is predicated upon the

general principle that subrogation is the result of natural justice in placing the burden where it ought to rest, depending, like other equitable doctrines, upon the facts and circumstances of each particular case, and unless the equities of the party seeking subrogation are greater than those of the party against whom subrogation is sought, it must be denied. Richardson v. American Surety Co., 97 Okla. 264, 223 P. 389; Southwestern Surety Ins. Co. v. Farris, 118 Okla. 188, 247 P. 392; City of Barnsdall v. Barnsdall National Bank, 164 Okla. 167, 23 P. 2d 373. It is also generally held that a surety of a public officer of a state or political subdivision thereof who has made good a loss occasioned by the principal's default or misconduct should be subrogated to the rights of the obligee against third persons. Annotation 24 A. L. R. 1523. This particular rule is, of course, to be considered in conjunction with the general principle of subrogation stated above.

The question presented, therefore, is whether the surety herein has equities superior to those in favor of the bank. Counsel for the bank contend that in weighing and considering the equities between it and the surety, proof of bad faith on the part of the bank by showing actual knowledge on its part that exchanging the sinking fund investments for other securities was in violation of section 5918, supra, is necessary to establish superior equities in favor of the surety. Counsel bases this argument upon the theory that constructive notice of statutory provisions is not such proof of bad faith or wrongdoing on the part of the bank as would establish superior equities in favor of the surety.

An analysis of the record discloses that the surety is beyond question an innocent party, while the bank and its employees knew from the time the bonds were deposited with said bank that Landrum, who deposited the bonds with the bank for safekeeping, was acting in his official capacity as county treasurer and that the bonds were not the property of Landrum. With that knowledge the bank participated in the illegal exchange of these bonds. It is evident, though, that the bank did not have knowledge of an existing conspiracy, if there was one, on the part of Landrum and Hutchman to embezzle the bonds after the exchange was made, but, as heretofore pointed out, the acts of Landrum and Hutchman subsequent to the delivery of the exchanged bonds to Landrum by the bank are wholly unrelated to the conversion of the bonds by the bank and immaterial to the determination of either the bank's liability to the county or the surety's right to subrogation.

Counsel does not cite any case wherein this court has passed upon the question of constructive notice as presented herein. However, we find that in the case of School District v. Stanley, supra, a related question was passed upon by this court. In that case the treasurer of the school district, in violation of section 5918, supra, sold certain bonds of the school district to the county treasurer of Marshall county and subsequently embezzled the proceeds of the sale. The school district brought suit against the county treasurer and the board of county commissioners to recover the specific bonds, and the county contended that it would be inequitable to force the county to return the bonds unless the school district returned the purchase price of said bonds to the county. It was held that the county was not, in equity, entitled to the return of the purchase price because anyone who deals with the officers of a municipal subdivision does so with knowledge of the limitations on the agent's authority, since all persons are presumed to know the law. Although this case is not squarely in point with the case at bar, it discloses that this court has heretofore recognized the theory of implied knowledge of statutory provisions in cases involving the application of equitable principles.

In Martin v. Federal Surety Co. (U. S. C. C. A.) 58 F. 2d 79, the Eighth Circuit Court of Appeals considered the argument advanced by counsel herein in a

case very similar to the instant case. In that case one Erskine procured a timber permit from the state of Minnesota to cut timber on certain tracts of state land and in accordance with the statute executed a surety bond insuring performance of his contract and payment for the timber cut thereon. Erskine then entered a contract to sell the manufactured timber products to Martin Brothers, who had advanced him the money on which to operate. Erskine cut the timber and delivered the products to Martin Brothers, but failed to pay the state according to the terms of his permit. Upon notice the surety paid the state and then brought this action against Martin Brothers seeking to be subrogated to the rights of the state and collect from them the money paid to the state under the surety bond. The statutes of that state provided that title to the timber cut under such permits remained in the state until fully paid for, and any attempted sale of such unpaid-for timber was void. Martin Brothers, the purchasers from the permit holder, advanced substantially the same argument that the bank does in the instant case regarding constructive notice of statutory provisions constituting b a d faith on the part of the party sought to be charged by subrogation. After a detailed discussion of practically all the authorities relied upon by counsel herein, that court held the surety was entitled to be subrogated to the rights of the state, and said:

"It would be a fair statement that many of the cases hold that if a third person has been free from negligence and has not participated consciously in the wrong, has had no notice that would put him on his guard, and that the principal was originally liable only because of a harsh rule of law, that in a contest between the third person and the surety the equities of the situation are with him, and therefore there should be no subrogation. We have referred to a number of these cases, but that is the extent we think to which any of them go. Many cases hold that where the original liability has been found to exist it is the end of the controversy and subrogation follows as a matter of course. Some confusion arises from failure to discriminate in some of the cases participation in a breach of trust as the ground of original liability which requires knowledge and participation in an act of conversion which does not require knowledge. In many of the cases the third person was found to have participated in a breach of trust as the only way of premising liability to the original creditor. * * *

"Under the doctrine as gathered from the various cases in this circuit we think that if appellants participated in the original wrong of Erskine by which liability on his part to the state was created, or if they were guilty of negligence in entering into and carrying out the arrangement had with him for the purchase of the timber, the appellee would be subrogated to the right of the state to recover against them in an action of conversion.

"* * * They legally knew what the law charged them with knowing. They therefore knew the facts which made their act wrongful in purchasing the timber from one who had no title thereto. Much is said in argument that the doctrine of constructive notice should not be extended. This has basis in some of the decisions, but it cannot be successfully contended that the doctrine extends neither to the provisions of the statutes of a state nor to information on file at a state office which a statute of the state specifically says shall constitute notice of the contents thereof."

In accordance with the above reasoning and conclusion, we hold the surety herein entitled to be subrogated to the rights of the county. Counsel's contention would bear more weight if the bank had not known that it was dealing with Landrum in his official capacity as county treasurer in exchanging county securities. It is not imposing an inequitable burden upon the bank to hold it must reimburse the surety for a loss occasioned by an illegal act in which the bank actively participated; if there had been no surety, the bank would have been liable for reimbursement of the county. See Bunting v. Ricks, 22 N. C. 130; Fidelity & Deposit Co. v. Queens County Trust Co. (N. Y.) 123 N. E. 370; Rivers v. Liberty National Bank (S. C.) 133 S. E. 210; Blake v. Traders' Natl. Bank, 145 Mass.

13; United States Fidelity & Guaranty Co. v. Peoples' Bank (Tenn.) 157 S. W. 414; 60 C. J. 765-6.

The final proposition argued by the plaintiff in error bank is that the acts of the employees of the bank in accepting and exchanging the bonds in question were ultra vires and no liability can be predicated thereon. In First National Bank v. Graham, 100 U. S. 699, 25 L. Ed. 750, it was held that a national bank had authority to accept such a special deposit of bonds. The United States Supreme Court in that case further pointed out that having accepted the bonds, conceding for the sake of argument that the agreement was illegal and void, nevertheless the only way the bank as a gratuitous bailee could have escaped liability would have been to return the property or dispose of it in some lawful manner, since corporations are liable for the wrongs they commit, and in such cases the doctrine of ultra vires has no application.

This court in Gilbert v. Citizens' Nat. Bank, 61 Okla. 112, 160 P. 635, after discussing the above case and numerous other authorities, said:

"It seems from these decisions that a clear distinction must be made according to the form of action brought by plaintiff, and that where the action is and can be maintained ex delicto, the question of a benefit received by the bank has nothing to do with the determination of the liability, nor is ultra vires a defense. As said by Mr. Morse in his work on Banks and Banking, sec. 728:

" 'A distinction must be made at the outset between ultra vires transactions which constitute tort and those involving matters of contract. No plea of ultra vires can ever avail to ward off liability for a tort. A tort is always ultra vires. It would be a lamentable state of law in which a court would allow a defendant to say, "I exceeded my power, and as the law will not recognize any transaction which involves its own violation, you cannot recover." ' "

The liability in the case at bar arising from tort, the foregoing rule is appli-cable and the defense of ultra vires is not available to the bank. See, also, Trustees v. Elon Trust Co. (N. C.) 109 S. E. 8; Security Nat. Bank v. Home Nat. Bank (Kan.) 187 P. 697; Sullivan v. Arkansas Valley Bank, 176 Ark. 278, 2 S. W. 2d 1096, 57 A. L. R. 296; Annotation in 57 A. L. R. 302.

The case of Weckler v. First National Bank (Md.) 20 Am. Rep. 95, upon which counsel for plaintiff in error bank rely is an expression of the minority rule accepted by few jurisdictions. See Annotation 57 A. L. R. 305.

The defendants in error in their cross-appeal assign as error the action of the trial court in adopting the measure of damages herein as being the highest market value of the converted securities between the date of the conversion and the judgment. In this the trial court erred. The proper measure of damages in an action of this particular nature is the face or par value of the bonds converted with accrued interest thereon as provided in the bonds where the highest market value is less than par value and accrued interest. National Surety Co. v. State ex rel. Richards, supra; Sanders v. Board of County Commissioners, supra.

We shall determine the proper amount of the judgment herein. While the total shortage disclosed by the audit of the treasurer's accounts was $39,310.66, the conversion of the sinking fund securities by the bank created only a part of that shortage. The county treasurer, Landrum, deposited the following bonds with the bank:

| | |
|---|---:|
| City of Muskogee Board of Education | $9,000.00 |
| City of Sulphur | 3,000.00 |
| City of Tecumseh | 5,000.00 |
| Texas County School District for collection at maturity | 2,000.00 |
| Tulsa County | 7,000,00 |
| Total | $26,000.00 |

When the audit was made only the fol-

lowing of the above bonds were found in the possession of the county:

| | |
|---|---|
| City of Tecumseh | $5,000.00 |
| Tulsa County | 2,000.00 |
| Total | $7,000.00 |

The bank had collected $2,029.16 upon maturity of the two Texas county school district bonds and invested the money in other bonds, except for $251.32, which was returned to the county in cash.

The bank was liable for the par value of the bonds and accrued interest, deposited with it which were exchanged for other bonds. However, since the City of Tecumseh bonds were found in the possession of the county, although they had been exchanged for others by the bank, the bank should not be held liable for their value. Thus the bank's total possible liability was for the par value of the following bonds with interest which had accrued according to the terms of said bonds since the date of conversion:

| | |
|---|---|
| City of Muskogee Board of Education | $9,000.00 |
| Tulsa County | 5,000.00 |
| City of Sulphur | 3,000.00 |
| Total | $17,000.00 |

and for $1777.84, the proceeds of the Texas county school district bonds which were not returned to the county in cash, with interest thereon at the rate of 6 per centum per annum from the date of conversion.

Although, as heretofore stated, the county cannot recover judgment against the bank in this action, it is necessary that we ascertain what rights, if any, may now exist in favor of the county against the bank before considering the judgment which should have been rendered as between the surety and the bank. The total loss suffered by the county was $39,310.66, and the county received $34,000 from the surety, leaving a loss to the county of $5,310.66. The fact that the county recouped part of its loss from the surety does not affect its right to recover from the wrongdoer that part of the loss which was not paid by the surety. There are no equities in favor of the bank as against the county which would entitle the bank to have the money received by the county from the surety applied first to that part of the shortage caused by the bank, and, since the money received from the surety was greater than the liability of the bank although less than the total shortage, the bank, a wrongdoer, would not be relieved of liability at the expense of the county. The surety has no interest in this sum of $5,310.66, since the county's rights are superior to those of the surety, a subrogee. The total liability of the bank to the county for the conversion of the bonds was $18,777.84, as stated above, and deducting therefrom the $5,310.66 to which the county is entitled as opposed to the surety, the sum of $13,467.18 remains, which is the largest possible sum the surety as subrogee could recover from the bank.

The record discloses, however, that the surety recovered a total of $17,259 from Hutchman, who had participated in the conversion of the bonds with the bank as well as in Landrum's acts misappropriating county funds. There is no evidence in the record which would justify the conclusion that this entire sum obtained from Hutchman by the surety was derived solely from the bonds embezzled by Hutchman and Landrum from Craig county rather than from the bonds which Hutchman and the bank converted or even from some source unrelated to either of these transactions; consequently, it would be equitable to take into consideration that sum or a part thereof in determining the amount the surety may recover from the bank. In deciding the amount to be offset against the bank's liability we shall consider the surety as being in the same position as the county would have been had the county recovered this money from Hutchman under similar circumstances but without a surety. The bank was liable to the county for $18,777.84 of the total shortage of $39,310.66, or 47.7 per cen-

tum thereof; therefore, the bank should be entitled to offset 47.7 per centum of the money recovered from Hutchman against its liability. Computing accordingly, the bank is liable to the surety in the sum of $5,234.64, the interest to be computed as heretofore stated, and the surety to receive its pro rata share thereof to be ascertained by the trial court.

Under the view we have taken, that part of the trial court's judgment directing the delivery of three City of Sapulpa funding bonds of 1919, Nos. 3 to 5, inclusive, to the bank upon the payment of the judgment herein, is erroneous and is vacated. The title to same can be determined in an appropriate proceeding, and this court herein expresses no opinion as to such title.

We affirm the judgment of the trial court in determining the existence of liability on the part of the bank to the surety company, leaving to the trial court the determination of the correct amount of interest accruing on said bonds under the rules laid down herein, and otherwise the judgment of the trial court is reversed and the cause remanded, with directions to the trial court to enter judgment in conformity with the views herein expressed, the costs in this court to be divided equally between the bank and the surety company.

BAYLESS, C. J., WELCH, V. C. J., and RILEY, DAVISON, and DANNER, JJ., concur. CORN, J., dissents. GIBSON, J., absent. HURST, J., not participating.