The NATIONAL BANK OF COMMERCE OF
TULSA, Plaintiff in Error,

v.

ABC CONSTRUCTION COMPANY and
Standard Accident Insurance Company, Defendants in Error.

No. 40737.

Supreme Court of Oklahoma.

Feb. 1, 1966.

Rehearing Denied July 18, 1967.

Second Rehearing Denied June 25, 1968.

Carl Pinkerton, James C. Pinkerton, Tulsa, for plaintiff in error.

James G. Davidson, Tulsa, Clyde J. Watts, Oklahoma City, for defendant in error ABC Const. Co.

Looney, Watts, Looney, Nichols & Johnson, Oklahoma City, of counsel, for defendant in error Standard Accident Ins. Co.

LAVENDER, Justice.

This cause involves a dispute between the National Bank of Commerce of Tulsa, Oklahoma, hereinafter referred to as "Bank," ABC Construction Company, hereinafter referred to as "ABC," and Standard Accident Insurance Company, hereinafter called "surety."

The dispute arose when one J. C. Johnson, an individual, doing business as Johnson Construction Company, hereinafter called "Johnson," admitted in writing that he was in default and would be unable to complete his sub-contract to do certain phases of the work in connection with the relocation of U. S. Highway 169 near the Oologah Reservoir. ABC was the prime contractor on the project with the United States of America by and through the U. S. Army Corps of Engineers as the other contracting party. Surety was the surety upon Johnson's performance bond and upon a labor and materialmen payment bond for Johnson. Bank was the holder of a $35,000.00 promissory note of Johnson secured by a written assignment from Johnson of monetary benefits he was to receive under his sub-contract.

ABC, as the prime contractor, agreed with the United States of America to furnish all the labor and materials for the relocation of U. S. Highway 169 near the Oologah Reservoir, for which ABC was to receive specified unit prices for the actual quantities of the various items of work and materials listed as being required to perform the contract according to the plans and specifications therefor. This contract provided, among other things, for the government to retain ten percent of the amount of each progressive estimate of work done and materials furnished until the project had been completed and accepted by the government.

On March 17, 1959, ABC entered into the written sub-contract with Johnson under which Johnson agreed to furnish all materials, equipment, tools and labor required to perform certain portions of the prime contract. What was to be done by Johnson was covered by "items" specified in the sub-contract and in accordance with the plans and specifications therefor included in the prime contract. The work was to be done in such a manner as not to delay the progress or completion of the prime contract project within the time allowed therefor in the prime contract. Johnson also agreed to keep the sub-contract project free and clear of all mechanic's liens or other encumbrances arising by act of Johnson or contract.

By the terms of this sub-contract, ABC agreed to pay Johnson, for the faithful performance of the sub-contract, a sum equal to five percent less than the amount derived by multiplying the quantity of each prime contract item furnished by Johnson by the unit price set forth in the prime contract for each such item furnished by Johnson, with the total estimated to be $368,972.88. Such consideration was to be paid by ABC to Johnson in installments as the

work progressed, on estimates of Johnson's proportionate part of all items furnished in the performance of the prime contract, as and when ABC received payment from the government on its progressive estimates of all items furnished in the performance of the prime contract, but with a provision that ten percent of Johnson's proportionate part of each ABC estimate should be retained by ABC until the final ABC estimate be made, completion of Johnson's sub-contract portion of the project be certified as satisfactory by the Corps of Engineers and ABC be paid therefor by the government. This sub-contract also provides:

"5. If Sub-contractor shall fail to prosecute said work or furnish said material as rapidly as the Contractor shall require, of if Sub-contractor shall fail to comply with the terms of the general contract or the Plans and Specifications as to quality of material or workmanship, or if Sub-contractor shall fail to furnish necessary material and complete said work in such manner as to permit completion of the entire contract upon the date specified in the general contract, the Contractor may on five (5) days' written notice relet the said work or any part thereof, or may purchase materials as the general contractor may determine, or may proceed to perform any or all portions of the sub-contract, and all costs of said material and expense for such labor shall be charged to the Sub-contractor and may be treated as payments to the Sub-contractor. The Sub-contractor shall be liable to the Contractor for any excess of expenditure so made over and above the sub-contract price fixed hereinafter.

"6. Sub-contractor agrees that in case of any error or default on his part in the performance of this sub-contract, Contractor may correct the error or perform the work as economically as possible and charge the cost thereof to Sub-contractor or deduct such cost from any sum due Sub-contractor hereunder."

Also under date of March 17, 1959, and pursuant to such sub-contract, Johnson, as principal, and the intervenor, Standard Accident Insurance Company, as surety for Johnson, executed and delivered to ABC, as obligee, two separate bonds, each with penalty of $184,486.44, one conditioned that Johnson would promptly make payment, to all claimants having a direct contract with Johnson, for all labor and material used or reasonably required for use in the performance of said sub-contract, including that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental of equipment, directly applicable to the sub-contract, and the other bond conditioned that Johnson would promptly and faithfully perform said sub-contract, which, by reference, was made a part of such bond.

As a condition precedent to and a part of the consideration for the execution of said bonds by the Surety, Johnson executed and delivered to the Surety a written application dated March 31, 1959 for said bonds, which application provided, inter alia, that Johnson would perform all the conditions of said bonds and any and all renewals and extensions thereof, which application included an assignment of money due Johnson under the sub-contract.

After the prime contract had been awarded to ABC, Johnson arranged with an officer of the National Bank of Commerce of Tulsa for the financing of Johnson's proposed sub-contract, upon proper assignment of the sub-contract to the Bank, approved or accepted by ABC. That information was conveyed by Johnson to ABC, and under date of April 6, 1959, the president of ABC, upon behalf of ABC, wrote the Bank a letter which reads as follows:

"This letter is to inform you that it will be permissible with the A.B.C. Construction Company for Mr. J. C. Johnson to give your bank an assignment on Contract Number DA–34–066–CIVENG–59–1114, covering the relocation of Highway #169, Oologah Reservoir Area, for the United States Corp of Engineers. Thank you in advance for your cooperation."

On November 4, 1959 the Bank loaned Johnson $35,000.00 and took from him his

promissory note in that amount secured by an assignment in writing, the material portions of which are as follows:

"Now, therefore, in consideration of the sum of One Dollar and other valuable considerations, the receipt of which is hereby acknowledged, and for the purpose of securing the payment of the above described indebtedness as evidenced by said promissory note(s) and all renewals, extentions and changes in form thereof, * * *. Assignor does hereby sell, assign, transfer, set over and convey unto the National Bank of Commerce of Tulsa all benefits accrued and to accrue hereafter under said contract and all sums of money due or to become due thereunder or by virtue of the fact that said contract has been entered into; provided, however, that this assignment shall not impose upon said Bank any of the obligations of said contract. Assignor does hereby irrevocably authorize and empower said Bank, without notice to Assignor, either in its name or in the name of the Assignor for the use and benefit of said Bank, to ask, demand, collect, compound and to prosecute any suit or proceedings for any or all of said sums and benefits hereby assigned. Assignor further authorizes said Bank to notify the other parties to said contract or any person now or hereafter obligated to pay any of said sums or benefits so assigned, of this assignment, by serving a copy hereof upon them or any of them and having the same properly. acknowledged and said Assignor does further agree that in making collections under this assignment the receipt of said Bank for any amount so collected, even though in excess of the amount due at that time under this assignment, shall be binding upon Assignor.

"Assignor * * * covenants and warrants * * * that the other parties to said contract have no offsets, counterclaims or other defenses to Assignor's right to receive payment under said contract; that Assignor has made no previous assignment thereof to any person, firm or corporation and knows of no fact or defense that will render the amounts due thereunder uncollectible."

The parties stipulated that no part of the $35,000.00 note had been paid, and that Johnson owed no other indebtedness to the Bank.

Upon the date of the assignment to the Bank, Johnson signed and acknowledged a notice of assignment stating that J. C. Johnson, of 3150 East 21st Place, in the City of Tulsa, Tulsa County, State of Oklahoma, "has assigned or intends to assign, one or more accounts to the Assignee, National Bank of Commerce, 10 East Third Street, in the City of Tulsa, County of Tulsa, State of Oklahoma," which was filed on November 4, 1959 in the office of the County Clerk of Tulsa County, State of Oklahoma.

Prior to the November 4, 1959 assignment, loans had been made by the Bank to Johnson and similar assignments taken by the Bank to secure the repayment thereof, and on assignments dated June 23, 1959 and August 13, 1959, an officer of ABC signed an endorsement at the end of the following printed provision: "Service of a copy of the above and foregoing assignment is hereby acknowledged and the undersigned agrees to pay, as, if and when due, said amount to the National Bank of Commerce of Tulsa." There is no evidence in the record before us that a copy of the November 4, 1959 assignment was served on ABC, or that ABC had specific knowledge of the last assignment.

However, there was undisputed testimony to the effect that, somewhere along the line, an officer of ABC notified an officer of the Bank that it would not be necessary to send ABC a copy of each assignment taken by the Bank from Johnson, and, in fact, requested that copies of such assignments not be sent to ABC; that ABC prepared and sent to the government periodical estimates of the quantities of each item estimated to have been furnished under the prime contract, which included items estimated to have been furnished by Johnson under his sub-contract during the period

covered by the estimate and showing the amount that would be due to ABC from the government at the unit price stated in the prime contract for each such item in the estimate; and that up until the time that a check was received by ABC from the government on December 10th or 11th, 1959, with respect to ABC's Estimate Number 8, which covered the period from October 21, 1959 to November 20, 1959, it had been ABC's practice, as requested by the Bank in its letter of April 21, 1959, transmitting to ABC a copy of the Johnson assignment to the Bank bearing that date, to mail to the Bank, within a few days after receipt of such a government check, an ABC check payable to the Bank and Johnson for Johnson's proportionate part of the amount received from the government with respect to each such estimate. In the absence of Johnson's default and notice thereof, ABC, after receiving the government check with respect to its estimate Number 8 on the 10th or 11th day of December, 1959, would have mailed to the Bank an ABC check, payable to the Bank and Johnson, in the amount of $20,907.96, as Johnson's apparent proportionate part of ABC's Estimate Number 8, covering the period from October 21, 1959, to November 20, 1959, and, as of November 20, 1959, Johnson would have had a credit on ABC's records for $19,446.06 accumulated as the ten percent "retainage" under his sub-contract with respect to said Estimate Number 8 and prior estimates. In other words, prior to receiving notice of Johnson's default and the Surety's request that ABC withhold any further payments to Johnson under his sub-contract, ABC considered itself bound by the Bank's assignment and the form of endorsement at the bottom of the assignment, in accordance with the terms and tenor of the Bank's printed form of assignment and endorsement at the bottom thereof, even though ABC had not endorsed the Bank's assignment dated November 4, 1959.

Sometime before December 4, 1959, Johnson began having trouble in meeting his weekly payrolls and in keeping up with the work under his sub-contract. The Surety learned of this and arranged a conference with Johnson on December 4, 1959, at which Johnson orally admitted his troubles and that he could not go on with his sub-contract. Later the same day, Johnson delivered to a representative of the Surety a letter dated that day, addressed to the Surety, and stating:

"This will acknowledge that the undersigned subcontractor is in default of the performance of work and payment of bills under the above contract as follows:

"1. According to the best available information there are unpaid bills outstanding to a total of $94,824.41 all of which is subject to verification.

"2. The undersigned unable to continue with the performance of work and meet payrolls for the current week.

"The undersigned therefore recognizes his default under the above sub-contract bond and his contract, the bond surety being the Standard Accident Insurance Company, and recognizes that the surety is entitled to the benefit of all rights and provisions in the bond application and indemnity agreement heretofore executed by the undersigned to the surety, together with rights of surety under the laws of Oklahoma and the United States of America."

A copy of this letter, together with a copy of the application by Johnson to the Surety for the above-mentioned performance bond and labor and material payment bond, were mailed to ABC by the Surety by letter dated December 4, 1959, which letter also requested ABC to hold all funds and proceeds of Johnson's sub-contract and not to pay any such funds or proceeds to Johnson or any assignee of Johnson.

Thereafter, Johnson took no further steps whatsoever concerning his sub-contract.

Some time between the 5th and 9th days of December, 1959, upon inquiry by an officer of the Bank as to when a check with respect to the last-preceding estimate would be forthcoming, an officer of ABC notified the Bank officer of Johnson's default

and the Surety's request that any money accrued or accruing to Johnson's credit under his sub-contract be withheld by ABC.

A copy of Johnson's application to the Surety for the performance bond and labor and material payment bond was not filed in the office of the County Clerk of Tulsa County until December 21, 1959; and under the undisputed testimony the Bank had no knowledge, or notice, of the assignment contained in such application at the time of making any of its loans to Johnson.

ABC made demand upon the Surety for the completion of Johnson's sub-contract and to save ABC harmless from all claims and demands with respect to Johnson's sub-contract.

As a result of such demand, the Surety paid all of Johnson's labor and material bills outstanding as of December 4, 1959, in a total amount in excess of $119,000.00, so that no such claims would be filed, and no such claims were filed, under the bonds required by federal statute in connection with ABC's prime contract with the government, or against the surety on those bonds of ABC; and by agreement between ABC and the Surety ABC had certain corrective work which should have been done by Johnson done by Smith Road Company, hereinafter called "Smith," on an emergency basis so that ABC could proceed with its portion of the project without further delay, and ABC paid Smith $2,500.00 for that work.

Also as a result of such demand by ABC, but without any written notice to Johnson, written contracts were entered into between ABC and the Surety, between ABC and A. K. McBride Construction Company, hereinafter called "McBride," and between the Surety and McBride, under which McBride furnished the uncompleted items of Johnson's sub-contract at negotiated unit prices, most of which were higher than the unit prices provided for such items by Johnson's sub-contract, and was paid therefor a total of $253,620.63, which was $52,487.90 in excess of the $201,132.73 total that the same quantity of the same items would have cost ABC under the Johnson sub-contract, with ABC having paid the $201,132.73 computed on the unit prices provided for in Johnson's sub-contract and the Surety having paid the additional $52,487.90.

In its final settlement with ABC under its prime contract, the government charged ABC the sum of $1,176.02 in penalties provided for in the prime contract for delays in the work that were caused by Johnson's delays in performing his portion of the project, and also "back-charged" ABC a total of $16,056.09 for over-payments to ABC on its prime contract estimates, in that amount, with respect to Johnson items included in estimates submitted by ABC and theretofore paid by the government in accordance with such estimates. Also, ABC claimed $2,166.10 against Johnson for additional expenses to it caused by Johnson's default and delays prior to default.

ABC made demand upon the Surety for reimbursement of those expenses and the government's charges and back-charges, above mentioned. All accounts between ABC and the Surety growing out of Johnson's sub-contract and bond transactions were balanced and settled prior to the trial of the cause, and neither was granted any judgment against the other.

By way of summarizing the facts, the record shows that the Bank in its petition against ABC as sole defendant pleaded the sub-contract between ABC and Johnson, the letter of April 6, 1959 from ABC to the Bank that it was permissible for Johnson to give the Bank an assignment of the sub-contract, several assignments from Johnson to the Bank, the indebtedness from Johnson to the Bank in the sum of $35,000.00 with interest thereon represented by the November 4, 1959 assignment, and further alleged that on or about December 1, 1959 there was due from ABC to Johnson under said sub-contract the sum of $20,907.96, and on or about said 1st day of December, 1959, ABC agreed with the Bank that the amount was due, and that it would pay that amount to the Bank regardless; and further alleged, as a second cause of action, that in addition to the above amount ABC owes to Johnson

as the "retainage" under his sub-contract, an amount which is unknown to the Bank. The Bank prayed for judgment against ABC on the first cause of action in said amount of $20,907.96, with interest at the rate of six per centum per annum; and, on its second cause of action, that ABC be required to account for the "retainage" under Johnson's sub-contract and to pay the amount thereof to the Bank.

By stipulation of the parties concerning various matters made at the trial, a statement of the amounts shown by ABC's records to have been earned by Johnson but not paid to him as of December 4, 1959, the date of Johnson's letter admitting default and inability to proceed with his sub-contract, was to be submitted later to the trial court and become a part of such stipulation, but no such statement appears in the record on appeal. Although it seems probable that Johnson furnished some items under his sub-contract between November 20, 1959 and December 4, 1959, the record on appeal does not shown any such additional items or any credits subsequent to November 20, 1959. Consequently, this court assumes herein that Johnson's credits on the records of ABC as of December 4, 1959, were the same as they were as of November 20, 1959: a total of $19,446.06 in accumulated "retainage" under his sub-contract and $20,907.96 as his estimated proportionate part of ABC's Estimate Number 8.

Since the only money involved in the Bank's action against ABC is the amount or amounts, if any, due or owing from ABC to Johnson under the above-mentioned sub-contract as of December 4, 1959, the date of his default, and since all of the parties rely upon the amount or amounts shown by the records of ABC, references to the amount or amounts due or owing, or appearing to be due or owing, to Johnson, without further identification, will mean the amount or amounts to his credit under that sub-contract as of December 4, 1959, on the records of ABC; and since the only bills of Johnson that are involved in the defenses of ABC and the Surety are bills incurred by Johnson for labor, materials, and rental and repairs of equipment used by him in the performance of the same sub-contract prior to his default and outstanding at the time of such default, references herein to outstanding bills of Johnson, without further identification, will mean bills incurred by Johnson for that purpose prior to December 4, 1959 and outstanding as of that date.

The basic contention of ABC and the Surety is, in substance and effect, that the Bank, as assignee of Johnson's benefits under his sub-contract, was in no better position than Johnson would have been in the absence of any assignment by him to the Bank; that each assignment from Johnson to the Bank covered only money which was "due" to Johnson, as distinguished from "owing" to him, at the time of such assignment, or which might thereafter become "due" to Johnson, as distinguished from "owing" to him; that the amounts paid out by ABC and the Surety in payment of Johnson's outstanding bills and as costs and expenses of and incidental to completing Johnson's sub-contract far exceeded the amount which appeared to be "owing" from ABC to Johnson as of the date of his default; and that after adjusting all accounts concerning the sub-contract, no amount actually was or is either "due" or "owing" from ABC to Johnson under his sub-contract or to the Bank under any assignment from Johnson.

In partial answer to this contention, the Bank contends that it was understood between the Bank and Johnson and ABC from the very beginning of Johnson's negotiations with the Bank for financing of his sub-contract operations that the Bank insisted upon getting an "iron-clad assignment of Johnson's share of each estimate payment; that ABC agreed to such arrangement, and after Johnson's default became known made a special agreement with the Bank that the Bank's assignment would have first priority as to the $20,907.96, which at that time appeared from ABC's records to be Johnson's share of ABC's es-

timate number 8, and that ABC would pay that amount to the Bank under its assignment, regardless of anything else. That contention is without merit. Each written assignment taken by the Bank superseded all oral negotiations or stipulations concerning the matter which preceded or accompanied the execution and delivery of the assignment (15 O.S.1961, Sec. 137). Apparently, the Bank's own printed form of assignment and endorsement thereon, used by the Bank in this case, was intended by the Bank to satisfy its insistence upon an "iron-clad assignment." Whether ABC could, by the alleged special agreement concerning the $20,907.96 estimate money, subordinate any rights of the Surety to the Bank's claim to such money is immaterial, for the evidence adduced by the Bank in support of this contention, including ABC's letter to the Bank under date of April 6, 1959, quoted above, was insufficient to establish any agreement or intent on the part of ABC that any assignment from Johnson to the Bank was to have any effect other than that provided by the Bank's printed form of assignment and endorsement thereon, signed by Johnson and endorsed by ABC.

Insofar as material herein, the Bank's own printed form of assignment, which it chose to use in this case, covered only money "due" from ABC to Johnson under his sub-contract at the time of the assignment or thereafter to become "due" from ABC to Johnson under his sub-contract, and under the printed form of endorsement at the bottom of such form of assignment, ABC, by signing it, would agree to pay to the Bank "as, if and when due" under such sub-contract the amounts provided for in the promissory note or notes described in the assignment. There was no assignment or agreement to pay to the Bank any money "owing," or to become "owing," to Johnson under his sub-contract.

From a consideration of the entire sub-contract, it is patent that the purpose of the provisions therein for ABC to retain a percentage of Johnson's estimated proportionate part of the amount of each estimate payment received by ABC from the government was to provide a cash fund which ABC (without having to call upon Johnson after he had received his estimated proportionate part of all ABC estimates, including its final estimate) could apply in settling all accounts with Johnson under his sub-contract; and the sub-contract expressly authorized ABC to apply, to the payment of any costs or expenses incurred under paragraph numbered 5 or 6 of the sub-contract, any money which otherwise would be owing from ABC to Johnson under the sub-contract.

Only the Bank's assignment dated November 4, 1959, is involved herein, since all indebtedness of Johnson to the Bank other than that evidenced by the $35,000.00 promissory note described in that assignment had been paid. Under Johnson's sub-contract, none of the accumulated "retainage" was "due" to him as of that date, and there is no contention that any other money was even "owing" to him under his sub-contract as of that date. Thereafter, because of his default, the only money other than accumulated "retainage" that could possibly become "due" to Johnson under his sub-contract was the $20,907.96, which as of the date of his default appeared to be his proportionate part of ABC's estimate number 8, and because of his default neither of those items was "due" to him as of December 4, 1959, because under the sub-contract ABC was entitled to apply both items to the costs and expenses incurred under paragraph numbered 5 or 6, or both, of the sub-contract, and also under the sub-contract was entitled to apply the "retainage" item to the settlement of all accounts with Johnson under his sub-contract, including costs and expenses incurred under paragraph numbered 5 or 6, or both, of the sub-contract; and under the Bank's assignment none of such money would become "due" to the Bank from ABC unless and until it should become "due" from ABC to Johnson under his sub-contract.

This is in harmony with the general rule that the assignee of a non-negotiable

chose in action acquires no greater right by virtue of the assignment than was possessed by the assignor at the time of the assignment, but simply "stands in the shoes of the assignor," and ordinarily is subject to any setoff or counterclaim available to the obligor against the assignor, and to all other defenses and equities which could have been asserted against the chose in action in the hands of the assignor at the time of the assignment. See 12 O.S.1961, Sec. 222; 6 Am.Jur.2d, Assignments, Sec. 102; Equitable Life Assurance Society of the United States et al. v. Weightman, 61 Okl. 106, 160 P. 629; Cooke v. Sinopoulo, 194 Okl. 352, 151 P.2d 791; Hudiburg Imported Cars, Inc. v. Hart, Okl., 383 P.2d 650.

The surety, being obligated to do so under Johnson's bonds, paid all of Johnson's outstanding bills, reimbursed ABC for the government's charges for delays chargeable to Johnson and back-charges with respect to work and materials estimated to have been furnished by Johnson but not furnished by him, and either paid directly or reimbursed ABC for substantially all, if not all, costs and expenses of and incidental to the completion of Johnson's sub-contract, other than that part of McBride's contract price for completing the sub-contract which was not in excess of Johnson's sub-contract price for the same work and materials, and claims by right of subrogation, as well as under its assignment from Johnson contained in his application for the bonds covering his sub-contract, to be entitled to reimbursement therefor out of any money which was owing from ABC to Johnson under his sub-contract as of the date of his default.

Applying both of Johnson's credits, totaling $40,354.02, as ABC was entitled under Johnson's sub-contract to do, to the payment of the costs and expenses of completing the unfinished portion of the sub-contract would completely wipe out those credits and leave nothing "due" or "owing" from ABC to Johnson under his sub-contract or to the Bank under its assignment from Johnson. Even without considering any other costs or expenses of or incident to completing Johnson's sub-contract, the $52,487.90 paid by the Surety to McBride as the excess of his contract price for completing the sub-contract over and above Johnson's sub-contract price for the same work and materials far exceeded Johnson's total credits as of the date of his default. The Bank makes no contention that the amount paid to McBride for completing the sub-contract was to any extent whatsoever excessive or unreasonable, or even that it was unnecessary to pay any more for completing the sub-contract than Johnson's sub-contract price for the same work and materials. So, if the Surety was entitled by subrogation or under its assignment to be reimbursed for this item out of any money owing from ABC to Johnson under his sub-contract, the trial court's judgment against the Bank was not erroneous.

We shall consider the matter of subrogation first. 15 O.S.1961, Sec. 382 provides, in pertinent part, that:

"A surety, upon satisfying the obligations of the principal, is entitled to enforce every remedy which the creditor then has against the principal, to the extent of reimbursing what he has expended; * * *."

A surety is entitled to be subrogated to all rights the creditor held against the principal for such part of the indebtedness as the surety pays and satisfies pursuant to the contract of suretyship. Stevens v. First National Bank of Muskogee, 117 Okl. 148, 245 P. 567; Anderson v. Reed et al., 133 Okl. 23, 270 P. 854. Also, see Janeway v. Security Bank & Trust Co. of Ponca City, 177 Okl. 342, 58 P.2d 892.

Directly concerning the costs and expenses of completing Johnson's sub-contract, the Bank contends that under the provisions of the sub-contract ABC had no right to relet the unfinished portion of the

sub-contract and to charge the costs and expenses of finishing the sub-contract against Johnson or any money owing to him under the sub-contract, without giving to Johnson the five days written notice provided for in paragraph numbered 5 of the sub-contract, quoted above; that by reletting such work without giving such notice to Johnson, ABC and the Surety violated the sub-contract and by seizing Johnson's "retainage" and estimate money then in the hands of ABC, in violation of the provisions of the sub-contract, ABC and the Surety wrongfully converted such money to their own use, and under the provisions of 42 O.S.1961, Sec. 22 lost any lien which they might otherwise have had upon such money. ABC and the Surety counter this argument with the contention that because of Johnson's complete default his sub-contract was completed under the provisions of paragraph numbered 6 of the sub-contract, also quoted above, which does not require any notice to Johnson before proceeding thereunder, but that if said paragraph numbered 5 and not said paragraph numbered 6 was applicable to the completion of the sub-contract because of Johnson's complete default, no notice to Johnson was required because Johnson had theretofore completely abandoned his sub-contract.

We believe that the purpose of the five days' notice provided for in paragraph numbered 5 of Johnson's sub-contract was to call his attention to any deficiencies in the performance of the sub-contract and to give him an opportunity to bring his work up to date and in conformity with the sub-contract. Johnson's letter to the Surety under date of December 4, 1959, clearly stated his inability to meet his payrolls and to proceed any further with the performance of any part of the sub-contract, and, in our opinion, evidenced his complete abandonment of the sub-contract as of that date. This view is supported by the fact that after his delivery of that letter on December 4, 1959, Johnson did nothing

more concerning the sub-contract or the performance thereof. Johnson did not need to have his attention called to his deficiencies and default. He was aware of them and had admitted them. Obviously, giving him the five days' notice provided for in paragraph numbered 5 of the sub-contract would have been a wholly vain and useless act and would only have caused further delay and expense to be charged against him. We conclude that, in the circumstances, notice to Johnson was not required even if his sub-contract was completed under the provisions of paragraph numbered 5 of the sub-contract; and that applying Johnson's "retainage" and estimate money then in the hands of ABC to the payment of the costs and expenses of completing Johnson's sub-contract was not in violation of the sub-contract and would not constitute a conversion of such money to the use of ABC and the Surety which would under the provisions of 42 O.S.1961, Sec. 22, extinguish their lien thereon.

The Bank invokes the rule set forth in this court's syllabus to the Fidelity & Casualty Company of New York v. National Bank of Tulsa, et al., Okl., 388 P.2d 497:

"Subrogation is an equitable doctrine to compel the ultimate discharge of an obligation by the party who in good conscience ought to pay it, and unless the equities of the party seeking subrogation are superior to those of the party against whom subrogation is sought it must be denied."

That syllabus was taken from Fourth National Bank of Tulsa, v. Board of Com'rs of Craig County et al., 186 Okl. 102, 95 P.2d 878, wherein the bank involved contended that the surety company involved was not entitled to be subrogated to the rights of the county, the obligee of the bond involved, because the equities in favor of the surety were not superior to those of the bank. This court said:

"* * * This contention is predicated upon the general principle that subroga-

tion is the result of natural justice in placing the burden where it ought to rest, *depending, like other equitable doctrines, upon the facts and circumstances of each particular case,* and unless the equities of the party seeking subrogation are greater than those of the party against whom subrogation is sought, it must be denied. Richardson v. American Surety Co., 97 Okl. 264, 223 P. 389; Southwestern Surety Ins. Co. v. Farriss, 118 Okl. 188, 247 P. 392; City of Barnsdall v. Barnsdall National Bank, 164 Okl. 167, 23 P.2d 373. * * *" (Emphasis supplied.)

This rule is stated in a slightly different way in Smith et al. v. Minter et al., 200 Okl. 208, 191 P.2d 929; Maryland Casualty Company v. King, Okl., 381 P.2d 153. In Richardson v. American Surety Co. et al. (cited in the Fourth National Bank of Tulsa case, supra), this court also held, in the fourth paragraph of the syllabus:

"No doctrine of equity jurisprudence is more beneficent in its operation than is subrogation, and perhaps none stands in higher favor. No general rule can be laid down which will afford a test in all cases for its application, and its exercise depends upon the particular facts and circumstances of each case, and is not enforced as a matter of legal right, but in order to subserve the ends of justice in the particular controversy under consideration."

In the present case, the Surety was obligated under its bond to see that Johnson's sub-contract was completed, at no more cost or expense to ABC than if Johnson had completed it. It was not a mere volunteer, as was the Bank in advancing its money under an assignment from Johnson. The Bank apparently recognizes that as between the Bank and the Surety, in the absence of some unusual fact or circumstance, the Surety would be entitled, by subrogation to the rights of ABC, to be reimbursed out of money otherwise owing from ABC to Johnson under his sub-contract for the additional costs and expenses of having Johnson's sub-contract completed, for on the point of superiority of the Surety's right by subrogation over the Bank's rights under its assignment from Johnson, the Bank merely contends that the Surety's rights by subrogation were either lost or subordinated to the Bank's rights under its assignment by certain actions which the Bank labels "inequitable conduct."

As this court understands that contention, the alleged "inequitable conduct" on the part of the Surety which the Bank claims would make its rights under its assignment equal, or superior, to the Surety's rights by subrogation consists of (a) delaying the filing of its assignment or notice thereof in the office of the county clerk, as provided for in 15 O.S.1961, Sec. 631 et seq., until after Johnson's default, thus inducing the Bank to make loans to Johnson which it would not have made, and (b) allowing Johnson up until the time of his default to retain and exercise unfettered control and use of the proceeds of his sub-contract, thus making the Surety's assignment fraudulent and void as to the Bank as a creditor of Johnson, and (c) compelling ABC to relet the unfinished portion of Johnson's sub-contract to McBride without giving Johnson the five days' written notice provided for in paragraph numbered 5 of the sub-contract and to apply the money then owing from ABC to Johnson to payment of the costs and expenses of completing the Johnson sub-contract, in violation of the sub-contract, thus converting such money to the use of ABC and the Surety and under the provisions of 42 O.S.1961, Sec. 22, extinguishing any lien ABC or the Surety might otherwise have had upon such money.

The last portion of such contention was disposed of above by our conclusion that, in the circumstances, notice to Johnson was not required. Certainly, in the circumstances, failure to give the notice provided

for in paragraph numbered 5 of Johnson's sub-contract, if the sub-contract was completed under the provisions of that paragraph, did not constitute "inequitable conduct" on the part of ABC and the Surety or either of them.

15 O.S.1961, Sec. 631 et seq., cited by the Bank in connection with the first part of this "inequitable conduct" contention, provide a method of "protecting" assignments and obtaining priority over other assignments by filing notice of the assignment in the office of the county clerk. They provide a statutory punishment or penalty for delay in filing notice of an assignment—loss, or possible loss, of priority with respect to a subsequent assignment or assignments. The Bank's assignment either has priority thereunder over the Surety's assignment or it does not. However, the Surety's rights by subrogation are separate and distinct from and independent of any rights it might have under its assignment, and under the principles of subrogation would exist even though there were no assignment to the Surety. The Bank's assignment from Johnson covered his monetary benefits under his sub-contract with ABC, so the Bank was charged with notice of the provisions of that sub-contract, including the provisions thereof requiring Johnson to furnish a performance bond and a labor and material payment bond, and the Bank knew, or should have known, that the surety on such bonds would, under the law, have certain rights by subrogation in the event of default by the principal in the payment of his bills for labor and materials or in the performance of other terms or conditions of the sub-contract. We conclude that, regardless of any effect upon the Surety's rights under its assignment from Johnson, the Surety's delay in filing its assignment or notice thereof in the office of the county clerk, as authorized by 15 O.S.1961, Sec. 631 et seq., did not constitute "inequitable conduct" on the part of the Surety, which would make the Surety's rights by subrogation less than superior to the Bank's rights under its assignment.

We fail to see how the second part of the Bank's "inequitable conduct" contention, that allowing Johnson to retain and exercise control and use of the proceeds of his sub-contract made the Surety's assignment fraudulent in law and void as to creditors, and the case cited by the Bank in support thereof (Benedict v. Ratner, 268 U.S. 353, 45 S.Ct. 566, 69 L.Ed. 991), could have any effect upon the Surety's separate and independent rights by subrogation. Benedict v. Ratner, supra, was a federal bankruptcy proceeding which arose in the State of New York. Only a few days more than four months before the bankruptcy proceedings was filed, the bankrupt corporation had assigned all of its book accounts, present and future, as security for a loan. The assignor was allowed to collect all of the accounts and to use the money as it saw fit, but was required to furnish to the assignee, at the time of the assignment and each month thereafter, a list of its then-current book accounts. Immediately before the bankruptcy proceeding was filed, the bankrupt paid part of its collections to the assignee and also delivered its then-current list of accounts to the assignee for collection by the assignee, and some were collected by the assignee. The Supreme Court of the United States held that such an assignment, with the assignor being allowed to retain and exercise control and use of the money for its own purposes, was, *under New York law,* fraudulent and void when made, and that, therefore, the payment to and collection by the assignee of some of the assigned accounts was inoperative to perfect a lien in the assignee, and having occurred during the four months preceding the filing of the bankruptcy proceeding constituted an unlawful preference. We find no Oklahoma statute providing, and no Oklahoma decision holding, that an assignment of the monetary benefits under a contract is fraudulent and void as to creditors if the assignor be allowed to receive such monetary benefits and use them for his own purposes until the happening of a specified event. Regardless of what Johnson may have done with the proceeds of his loans

from the Bank, all of the proceeds of Johnson's sub-contract until his default were paid to the Bank and Johnson, and most, if not all, of the proceeds of the sub-contract paid to the Bank and Johnson were used to repay the Bank's loans. Although it could be that the assignee would lose his lien under such an assignment as to any proceeds actually collected by or for the assignor (In re Cleapor, D.C., 16 F.Supp. 481), money actually paid to Johnson or to the Bank and Johnson is not involved in the case at bar. At any rate, subrogation was not involved in Benedict v. Ratner, supra, relied upon by the Bank, and this contention of the Bank is without merit.

It is the opinion of this court that in the circumstances involved in this case the Surety's right, by subrogation to ABC's right, under the sub-contract between ABC and Johnson, to have any proceeds of Johnson's sub-contract in the hands of ABC at the time of Johnson's default applied to the payment of that part of McBride's contract price for completing the unfinished portion of such sub-contract which was in excess of Johnson's sub-contract price for the same work and materials was and is superior to the rights of the Bank under its assignment from Johnson, and that so applying such proceeds would leave nothing due or owing from ABC to Johnson under his sub-contract or to the Bank under its assignment from Johnson. This means that the trial court did not err in rendering judgment against the plaintiff Bank.

The above disposition of the case makes it unnecessary to consider the Bank's contentions involving the matter of priority as between the Bank's assignment and the Surety's assignment or any of its other contentions not discussed hereinabove.

Judgment affirmed.

JACKSON, V. C. J., and DAVISON, WILLIAMS, BLACKBIRD and IRWIN, JJ., concur.

HALLEY, C. J., and BERRY and HODGES, JJ., dissent.