FIREMAN'S FUND INSURANCE COM-
PANY, a corporation, Plaintiff,
Appellant,

v.

S. E. K. CONSTRUCTION COMPANY,
Inc., etc., et al., Defendants,

and

Centennial State Bank, a Kansas Bank-
ing Corporation, and Industrial State
Bank of Kansas City, Kansas, Defend-
ants, Appellees.

Nos. 296-69, 297-69.

United States Court of Appeals,
Tenth Circuit.

Jan. 12, 1971.

Clyde J. Watts, Oklahoma City, Okl., for appellant.

Arthur J. Doyle, Kansas City, Mo. (Jerome T. Wolf, Kansas City, Mo., on the brief), for Centennial State Bank, appellee.

Before PHILLIPS, HILL and HICKEY,* Circuit Judges.

HILL, Circuit Judge.

Appellant Fireman's Fund, surety on two performance bonds naming S.E.K. Construction Company as principal, seeks to enjoin Centennial State Bank, to whom S.E.K. assigned Estimate 13 on an Oklahoma Highway project, from disposing of the warrant representing Estimate 13 until the equities of the case are litigated. In addition, the original injunction proceeding sought to prevent the banks from taking possession of S. E.K. equipment in which both banks had perfected security interests. A temporary restraining order was secured by Fireman's but they later dismissed that

---

* Judge Hickey, because of his death on September 22, 1970, did not participate in this opinion.

part of the injunction suit which restrained the banks' possession of the equipment.

At trial, the litigation focused on whether the surety or the assignee-bank was entitled to the proceeds of Estimate 13. The case, based on diversity jurisdiction, was tried to the court without a jury. After making extensive findings of fact, the court concluded that Centennial was entitled to the $17,467.38 of Estimate 13. To rectify the wrong suffered because of the wrongful injunction, which prohibited immediate possession of the equipment, the banks were awarded $8,701 for fair rental value and $1,116.55 for out-of-pocket expenses incurred;[1] and Industrial State Bank was granted $1,494.60 for expenses resulting from its aborted repossession attempt. Attorneys' fees of $4,000 were denied the banks. Fireman's appeals that portion of the judgment granting the proceeds of Estimate 13 to Centennial. The banks, *inter alia*, challenge the denial of attorneys' fees on cross-appeal.

The controversy, as it reaches us on appeal, directly concerns four corporations. Fireman's, the surety and original plaintiff, is a California insurance corporation duly authorized to transact surety business in Oklahoma. S.E.K. Construction Company, Inc., an original defendant, is a Kansas corporation which, in 1967, bid and received two contracts for highway construction in Osage and Comanche Counties, Oklahoma. Centennial is a Kansas banking corporation which commenced financing S.E.K. in 1966 and continued until just prior to this suit. In February, 1966, Centennial received and perfected a security interest in certain of S.E.K.'s automotive, road-building, and other construction equipment, including all after-acquired property of the same type. Industrial financed S.E.K. from October, 1966, until just prior to the date of the filing of this suit and had an installment note for $95,000 secured by a per-

fected security agreement covering other portions of S.E.K.'s equipment.

In August, 1967, S.E.K. received the two Oklahoma highway construction contracts. Performance and payment bonds covering the two projects were executed and delivered by Fireman's with S.E.K. as principal and the State of Oklahoma as obligee. In addition, Mr. and Mrs. Hugh O'Donnell and Mr. and Mrs. George O'Donnell executed and delivered to Fireman's a general indemnity agreement, naming the individual owners of S.E.K. as indemnitors.

In the fall of 1967, Centennial made a loan to S.E.K. which was secured by an assignment of the contract proceeds from the two jobs, and was indicated on renewal notes of loans thereafter made between Centennial and S.E.K. As construction work progressed, Fireman's on February 15, 1968, inquired of S.E.K.'s Vice-President as to the general financial status of the company. Hugh O'Donnell replied that they were in good shape as far as keeping their bills paid.

A month later, however, S.E.K. voluntarily disclosed to Fireman's that the contractor had $140,000 in outstanding bills, many of which were past due, but that temporary credit arrangements had been made with some of the creditors. After learning of this, and relying on Hugh O'Donnell's figures, Fireman's estimated that upon completion of both jobs, there would be a loss of $60,000 on the Osage job and a profit of $40,000 on the Comanche project. Thus, the net loss would equal $20,000 after payment of the outstanding $140,000.

In the meantime, on March 13, 1968, a $10,000 note had become due and Centennial requested and S.E.K. agreed to endorse on Progressive Estimate 11 for the Osage job, its assignment to Centennial of the $21,937.29 due thereunder. This endorsement was made pursuant to S.E.K.'s 1967 assignment of contract proceeds to Centennial. The procedure

---

1. The parties stipulated and agreed that any judgment against Fireman's and in favor of either of the banks may be made jointly to the banks and will be allocated by and between them.

was to be that Centennial would satisfy the $10,000 overdue note and deposit the remainder of the warrant in S.E.K.'s account. But on March 21, Fireman's filed suit in federal court and procured from the court a restraining order prohibiting Centennial from cashing the warrant. Late that same day, Fireman's agent erroneously advised Centennial by telegram that the court order prohibited "any further activity on S.E.K.'s accounts, including the cashing or clearing of checks of S.E.K."

As of March 21, S.E.K. had in excess of $15,000 in its Centennial account. However, following what it understood as a court directive, Centennial dishonored checks presented for payment on S.E.K.'s account. Although the checks were marked "Refer to Maker" and not "I.S.F.", the dishonoring of those drafts created multiple problems for S.E.K. and temporarily damaged the latter's credit arrangements.

On March 26, representatives and lawyers from S.E.K., Fireman's and Centennial met to attempt to resolve S.E.K.'s financial problems and the difficulties between Centennial and Fireman's ensuing from the erroneous telegram. As a result of that meeting, on March 27, Fireman's filed a motion to dismiss their suit in federal court. The Order recites in part: "This dismissal is without prejudice to plaintiff re-filing the same if it appears at any time hereafter that S.E.K. Construction Company is in default under the terms and conditions of the bonds and indemnity agreements involved herein."

The agreement upon which the foregoing Order of Dismissal was based recites in pertinent part, "that S.E.K. is not now and has not been in default on these contracts and that the Fund [Fireman's] was in error in so advising of the defaults. If any notices of claims or claims were filed on the bonds, these will be transmitted to S.E.K. for it to handle and no action will be taken by the Fund on any claims and on or under any bonds on these projects unless and until S.E.K. has failed to satisfy any claim(s) within a reasonable time after receipt of written notice by the Fund to S.E.K. of a formal claim being filed with the Fund."

After the dismissal, S.E.K. made application to Centennial for an additional $40,000 loan. Centennial agreed to explore the possibilities, upon the understanding that they would have the right of offset on S.E.K.'s accounts and S.E.K. would agree to joint control of its accounts with Centennial.

On April 11, 1968, S.E.K.'s loan request was tabled. On April 16, Centennial rejected the additional loan request and called other loans which had an outstanding balance of $58,000; S.E.K.'s Superintendent assigned, by endorsement, Estimate 13 for $17,467.38 to Centennial; and S.E.K.'s remaining bank balance of $25,423.06 was charged to offset, in part, their indebtedness to Centennial. Industrial also called the loans it had made to S.E.K., and so notified them.

During the forenoon of April 25, 1968, Centennial made formal demand upon the Comptroller of the Oklahoma Highway Department for the $17,467.38 warrant assigned to it. However, at the request of Fireman's attorney, the Comptroller withheld delivery. During the afternoon of April 25, Fireman's paid $50,000 to Riffe Petroleum Company for the account of S.E.K., without notice to the latter. On the following day, Fireman's filed this action.

On appeal, Fireman's sets forth five propositions upon which they urge reversal. We will consider each independently except when arguments under several propositions coalesce. The first contention asserts that when a surety is placed in jeopardy by the acts or omissions of its principal, a court of equity has jurisdiction to prevent a *threatened wrong* by requiring the state to withhold payment of contract funds to an assignee bank, until it can be ascertained whether the surety is really in jeopardy of sustaining a loss under its performance and payment bond. This right of

action is said to lie upon a bill quia timet.

We perceive several objections to the case proceeding on the stated equitable ground. "No principle in equity is more familiar, or more firmly established, than that a surety, *after the debt for which he is liable has become due*, without paying or being called on to pay it, may file a bill in equity in the nature of a bill quia timet to compel the principal to exonerate him from liability by its payment, provided no rights of the creditor are prejudiced thereby." 50 Am.Jur. Suretyship § 225. The doctrine is not premised on mere fear of loss or liability prior to an obligation's maturity. Rather, only after the obligation becomes payable, the surety, before he pays it, may maintain a suit in equity against the debtor in the nature of a bill quia timet to compel the latter to pay the debt or perform the obligation, provided the creditor could enforce payment or performance but neglects or refuses to do it.[2]

The cases in Oklahoma on the common law doctrine of quia timet, as applied to a surety case, are scarce, if existent. Neither litigant cites any Oklahoma authority on this narrow question and our independent research has uncovered none. Fireman's relies exclusively on Morley Construction Company v. Maryland Casualty Company, 90 F.2d 976 (8th Cir. 1937), to support their novel theory.[3]

The Morley case applied the identical rules we have heretofore set out, and reached the decision that a bill in the nature of quia timet permitted the surety's exoneration, only because of facts which do not exist in the instant suit.[4] First, the construction company was insolvent when the bill of complaint was filed. Second, the creditors were demanding payment on past due bills. Third, an agreement had been entered into between surety and principal whereby the former loaned the latter large sums of money to keep the company operational, in exchange for which the principal agreed to first apply the construction contract proceeds to bills for labor and materials furnished.

Aside from the fact that the case does not represent Oklahoma law, its facts remove it from any analogous ties with the present suit. In the instant suit, the trial court found that at all times prior to May 1, 1968, S.E.K. was not technically insolvent, was not in bankruptcy, had no judgments against it which it had failed to pay, and no claims had been filed by any creditor of S.E.K. with the Oklahoma State Highway Department which would give it cause to withhold payment. Furthermore, if any claim had been filed with Fireman's, no notice thereof had been forwarded to S.E.K. in accordance with the March 27, 1968, agreement. Specifically, the court found that Fireman's payment of $50,000 to Riffe was but an attempt to put S.E.K. in default so that this suit could be brought. These findings are supported by substantial evidence and we will not reverse.[5]

One other fact buttresses our conclusion that Fireman's cause is founded on nonexistent bases. Oklahoma has provided, in 12 Okl.St.Anno. § 1108,[6] the mechanism whereby a surety

---

2. 4 Pomeroy's Equity Jurisprudence (5th Ed.) § 1417 at 1070–71.

3. Only one other suit involving a similar theory is found, Re Anderson Berry [1928] 1 Ch. (Eng.) 290, 15 BRC 928.

4. The complete facts are set out in Morley Const. Co. v. Maryland Cas. Co., 84 F.2d 522 (8th Cir. 1936).

5. Butler Paper Co. v. Business Forms, Ltd. [Maneke-Kinzie Printing Co.], 424 F.2d 247 (10th Cir. 1970) ; Knauff v. Utah Constr. & Min. Co., 408 F.2d 958 (10th Cir. 1969) ; Continental Cas. Co. v. Rose, 405 F.2d 1195 (10th Cir. 1969).

6. "A surety may maintain an action against his principal, to obtain indemnity against the debt or liability for which he is bound, before it is due, whenever any of the grounds exist, upon which, by the provisions of this code, an order may be made for arrest and bail, or for an attachment."

may sue his principal before the debt or liability is due. This statute was meant to change the common law rule so that a surety may maintain an action against his principal to obtain indemnity against a debt or obligation for which he is bound before it is due, provided grounds exist upon which an order of attachment may issue. Walton v. Williams, 5 Okl. 642, 49 P. 1022 (1897).

Under 12 Okl.St.Anno. § 1151 a plaintiff may attach property of a foreign corporation when it "has assigned * * * or is about to dispose of * * * property with the intent to defraud, hinder or delay * * * creditors * * *." The Supreme Court of Oklahoma has long held that "a debtor, though in failing circumstances, may prefer one or more of his creditors to the exclusion of the rest, and such preference is not in itself sufficient to sustain an attachment upon the ground that the defendant has disposed of his property with the intent to defraud, hinder, or delay his creditors." First State Bank of Durant v. Smith, 43 Okl. 320, 140 P. 150, Syl. 3 (1914). Under that statement of the law, we are unable to envisage any right of Fireman's to maintain an action on 12 Okl. St.Anno. § 1108.

■ Second, appellant maintains that its rights, as surety under exoneration and subrogation, to require application of the contract funds toward reduction of the surety's liability or loss, are paramount to the claims of the assignee-bank which stands in the same shoes as the assignor-contractor.[7] Laying all collateral arguments aside, the contention prevails or fails on one fact: Was the contractor in default at the time the suit was instituted? Only if the contractor

was then in default will the rights of the surety prevail over those of the contractor, hence the bank.[8]

In an attempt to display S.E.K.'s default, appellant points to the Riffe claim which it paid "which was long past due, and for which demand had been made by the creditor." Ignoring the admitted failure of Fireman's to notify S.E.K. of any such claims, the argument fails for other reasons. The lower court specifically found that Fireman's knew that the Riffe bill was a bona fide disputed claim which was disclosed to appellant as early as February, 1968, and was mentioned in the March 27, 1968, agreement. Furthermore, the record stands in full support of the findings we earlier recited to the effect that S.E.K. was not in default prior to May 1, 1968. Hence, the conclusion to which we are impelled is that in the absence of S.E.K.'s default, the surety's rights do not preempt those of S.E.K.'s or its assignee's.

Third, appellant submits that under the surety's contractual rights of indemnity against liability in the Indemnity Agreement, a formal default would not be a condition precedent to surety's rights to equitable relief from the jeopardy of outstanding and unpaid bills.

■ Appellant contends that since the Agreement was meant to indemnify Fireman's against liability, a fear of liability by the surety is legal ground for an exoneration suit on the contract. But the cases cited by appellant do not support this theory. "[I]ndemnitee need not prove actual loss but only that he has become liable." Alberts v. American Casualty Company, 88 Cal.App.2d 891, 200 P.2d 37, 42 (1948). And in Sorensen v. Overland Corporation, 142 F. Supp. 354, 361 (D.Del.1956): "Indem-

7. National Bank of Commerce of Tulsa v. ABC Constr. Co., 442 P.2d 269 (Okl. 1966); Selected Investments Corp. v. Lester, 327 P.2d 668 (Okl.1958).

8. Standard Acc. Ins. Co. v. Fed. Nat'l Bank, 112 F.2d 692, 694 (10th Cir. 1940): "Where a surety of a construction contractor, *upon the contractor's default,*

completes the contract, and the contractee has funds in his hands earned by the contractor, the surety is entitled to be subrogated to the rights which the contractee, *upon the contractor's default,* could assert against such funds, to the extent necessary to reimburse the surety for the outlay made to complete the contract." [Emphasis added.]

nity against liability accrues * * * when indemnitor-liability becomes fixed and ascertained or as soon as the debt becomes due." Both Morley Construction Company v. Maryland Casualty Company, supra, and Western Casualty and Surety Company v. Biggs, 217 F.2d 163 (7th Cir. 1954) predicate all surety rights on default of matured debts. Here, the district court specifically found that S.E.K. had at all times prior to May 1, 1968, and in conformity with its agreements with Fireman's, made credit arrangements with its suppliers which, as between such parties, effectively extended maturities thereof. And neither S.E.K. nor Fireman's considered such bills as "past due." There is no clear error evident here.

■ Fourth, Fireman's contends that the bank suffered no prejudice nor did it change its position in reliance on the surety's conduct or acts. Again sweeping aside all incidental considerations, the allegation is not supported by the record. On March 21, S.E.K. had over $15,000 in its account with Centennial. S.E.K. had endorsed Estimate 11 in the amount of $21,937.29 to Centennial, delivery of which was restrained by the March 21 lawsuit. Thus, on March 21, Centennial would have been in a position to offset in excess of $36,000. But as a result of the March 27 settlement and dismissal, Centennial applied only $10,000 on the indebtedness and credited the remainder to S.E.K.'s account. Furthermore, between March 21 and April 17, S.E.K. wrote in excess of $25,000 worth of checks on its Centennial account, most of which went for lienable items on the two Oklahoma projects. And finally, both banks allowed S.E.K. to retain possession and use of its equipment on the two projects from March 27 to April 25,

which depreciated the security value held by the banks.

Finally, appellant argues that its right to proceed in equity cannot be barred by the terms of the March 27 agreement, to give notice to S.E.K. of claims against the bond. They say this suit resulted not because a claim on the bond was presented, but because of the wrongful assignment and the jeopardy of loss which resulted. This is but another route in attempting to proceed under the doctrine of quia timet. We have considered the tenet above and are not disposed to restate it.

■ Appellee banks have cross-appealed on two matters. First, they urge that the trial court's denial of reasonable attorneys' fees in connection with the wrongful injunction, with respect to S.E.K.'s equipment, was error. There is no doubt that if Oklahoma law applies, the attorneys' fees must be awarded. But the lower court concluded on the basis of Heiser v. Woodruff, 128 F.2d 178 (10th Cir. 1942), that since the bond and temporary restraining order were executed pursuant to federal statute and Rule 65(c), F.R.Civ.P., 28 U.S.C., federal law, which allows no such recovery, controls.

The theory that state law should control the question in this, a diversity suit, is attractive.[9] But Heiser presents the better considered rule. When an injunction suit is commenced in federal court and an injunction bond is issued pursuant to Rule 65(c), local state law, with respect to recovery of attorneys' fees in an action on the injunction bond, has no application.[10] Rule 65(c) requires the applicant for a restraining order or preliminary injunction to give security, in such sum as the court deems proper, for the payment of such "costs and dam-

9. Bulova Watch Co. v. Rogers-Kent, Inc., 181 F.Supp. 340 (E.D.S.C.1960) is the only case cited to support appellees' argument.

10. Heiser v. Woodruff, 128 F.2d 178 (10th Cir. 1942); see Powelton Civic Home Own. Ass'n v. Department of Housing & Urban Dev., 284 F.Supp. 809 (E.D.Pa. 1968); Monolith Portland Midwest Co. v. Reconstruction Finance Corp., 128 F. Supp. 824 (S.D.Cal.1955); 7 Moore's Fed.Prac. ¶ 65.10 [1] at 1657-58; Anno. 164 A.L.R. 1088, 1111 Injunction Bond— Attorneys' Fees.

ages" as may result to any party who is found to have been wrongfully restrained or enjoined. The question then becomes one of federal law as to what is included in the recoverability clause. Thus, the rule advanced by Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L.Ed. 118 (1938), does not apply since a federal question is involved. Under federal case law, attorneys' fees in this case are not recoverable.[11]

■ The second count of appellees' cross-appeal is based on the argument that the trial court erred by failing to conclude that Fireman's filing of the wrongful injunction also constituted "willful abuse of process." We have carefully reviewed the answer, the opening statements by counsel, trial and posttrial motions, along with the notice of appeal filed by appellee. Our conclusion is that this theory was not before the trial court for decision and there is room for valid doubt that the notice of appeal intended to assert such theory.

In their answer, the banks counterclaimed on two counts. The first count prayed for $10,500 which allegedly represented reasonable rental value of S.E. K. equipment from April 29, 1968, until May 9, 1968. Count two alleged that on May 3, 1968, before a federal judge, Fireman's agreed not to use or move S. E.K.s equipment and would make it secure from damages until the priorities of secured creditors were settled. But that Fireman's had permitted use of the equipment and had fraudulently misrepresented their intention to the banks. The prayer requested $10,500 for breach of the stipulation and $150,000 in exemplary damages for the fraudulent misrepresentations. Try as we may, we are unable to construe that as an allegation

that the wrongful injunction suit was a malicious prosecution.

■ Appellee seeks to justify the absence of pre-trial notice by their post-trial motion to conform the evidence to the pleadings. While such motion permits greater latitude for parties in the position of these appellees, it is obvious that their motion was not intended to include the proposition they now urge.[12] But even if the issue were before the court, we find no clear error in the finding that although Fireman's actions were wrongful, there was no malice, fraud or oppression in their behavior.

Affirmed.

---

11. Heiser v. Woodruff, 128 F.2d 178 (10th Cir. 1942) and cases cited therein.

12. "Your Honor, we will ask permission of the Court * * * to amend [the banks'] pleadings to conform with the evidence in this case. I am thinking specifically of the items with respect to the rental value of the equipment. We had originally used a figure in the pleading, I believe, of $10,500; we believe that our evidence shows a greater sum, we ask permission to amend that."